**COLUMBIA BROADCASTING SYSTEM, INC., and Columbia Record Club, Inc., Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 16492.

United States Court of Appeals
Seventh Circuit.

June 26, 1969.

Asa D. Sokolow, New York City, Earl E. Pollock, Chicago, Ill., Stuart Robinowitz, Renee J. Roberts, New York City, for petitioners; Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City, Sonnenschein, Levinson, Carlin, Nath & Rosenthal, Chicago, Ill., of counsel.

J. B. Truly, Gerald Harwood, Federal Trade Commission, Washington, D. C., James McI. Henderson, General Counsel, J. William Brennan, Attorney for Federal Trade Commission, for respondent.

Before KNOCH, Senior Circuit Judge, and KILEY and KERNER, Circuit Judges.

KERNER, Circuit Judge.

The Federal Trade Commission issued a complaint on June 25, 1962, against Columbia Broadcasting System, Inc. (CBS) charging CBS and its subsidiary, Columbia Record Club, Inc. (Club) with violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.[1] Hearings were held and the hearing examiner entered an order on September 30, 1964, dismissing the complaint. On July 25, 1967, the Commission, Commissioner Elman not concurring, reversed the examiner's findings and from this decision CBS appeals.

Columbia Broadcasting System, Inc, is a corporation organized under the laws of New York with its principal place of business in New York City. One of its operating divisions, Columbia Records (Columbia), manufactures and sells phonographic records. In 1961 this division produced 20% of CBS' total sales.

Total sales in the record industry were $521 million in 1960. Columbia Records, the leading producer and seller, accounted for 21% of the industry's total sales. The "Big Three" record manufacturers, Columbia, R.C.A. and Capitol, produced 48% of total sales. Most of the records sold are LPs (long playing) and singles: in 1961 the breakdown in dollar volume was LPs, 75%; singles, 24%; and EPs (extended play) 1%. Columbia's share of LP sales was 25.4% while the Big Three together, shared 56.5% of the LP market.

Columbia has two main channels of record distribution: 1) the records are sold to distributors, either Columbia owned or independent, who sell them to subdistributors and independent retailers; or 2) the records are sold directly by the Columbia Record Club to the consumer through the use of a "subscription" form of mail order business. In 1961 and 1962, Club sales were 50% of Columbia's total record dollar sales.

Columbia entered the mail order subscription sale of records by forming the Columbia Record Club in 1955 in response to a threat of competition from other companies. The Club's method of mail order sale was to induce the consumer to join the Club and agree to purchase a minimum number of records during the year by offering a certain number of records at below cost prices. For example, in 1963, the Club's offer consisted of six

1. Section 5(a) (1): Unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce are hereby declared unlawful (15 U.S.C. 45(a) (1)).

records for an aggregate price of $1.89 plus 55¢ postage provided the new member agreed to buy another six records in the next twelve months at the list price of $3.98 each plus 35¢ postage per record. In the second year of membership, for every two records a member purchased, he received one free. The first year the member paid an average of $2.37 per record and in the second year the average price was $2.88 per record.

From 1955–58, the Club only sold Columbia records. However, in 1958, the Club decided to sell records of competitors. To acquire a more diversified catalog, the Club entered into licensing agreements with some of the small record manufacturers.[2] The agreements had a duration of from one to three years with options to renew. Columbia guaranteed the sale of a certain number of records in return for an agreement by the licensor not to sell any of its catalog to another club. The licensor could still sell to wholesalers who could in turn sell to other clubs or retailers.

The licensing agreements also provided that the licensors should make every effort to reduce royalties paid to artists on records sold through the Club. Columbia's practice was to pay an artist only 50% of his royalty on records sold by the Club and no royalty on free bonus records offered by the Club. The licensing agreements contained a provision requiring the licensor to follow the same policy wherever it was practicable. In certain contracts Columbia only agreed to be liable for royalties paid at these reduced rates and any royalty paid by the licensor above these rates was to be absorbed by the licensor.

In 1960, Columbia's share of record club sales was 56% while the Big Three together accounted for 90.6% of total sales through clubs. Columbia Club was the only club offering outside labels to its members. In 1961, Columbia's licensors accounted for 11% of total record sales. Of the 150 largest selling monaural LPs on March 24, 1962, 103 of these records were on Columbia, Columbia licensors, R.C.A. or Capitol labels. Columbia and its licensors, alone, accounted for 65 of the "hits" or 43.3%, while the licensors themselves had 33 of the records on the listing or 22%.

The total acquisition cost to the Club of a record produced under a licensing agreement was 87.5¢. The Club's cost of marketing these records is $1.255 and when added to the acquisition cost, the

2.

| Licensor Record Manufacturer | Date of Contract | Licensor's Share of Retail Dealer Sales in Year Prior to Contract | |
|---|---|---|---|
| | | As a % of Total Record Dollar Sales | As a % of Total LP Dollar Sales |
| 1. Caedmon | 5/15/58 | —% | —% |
| 2. Verve | 3/31/59 | 0.6 | 1.1 |
| 3. Mercury | 4/ 1/60 | 3.5 | 2.7 |
| 4. Warner Brothers | 9/15/60 | 1.5 | 1.4 |
| 5. Kapp | 10/ 7/60 | 1.7 | 1.8 |
| 6. Vanguard | 6/ 1/61 | * | 1.5 |
| 7. United Artists | 7/ 1/61 | 1.6 | 1.1 |
| 8. Liberty | 10/25/61 | 1.7 | 1.0 |
| 9. Cameo-Parkway | 12/15/61 | 1.2 | 0.7 |
| Total | | 11.8% | 11.3% |

* Indicates less than 0.5%

total cost is $2.13.[3] The acquisition cost to a competitor, either retailer or club, ranges from $1.60 to $2.47 for the same record. The average cost to Columbia retailers was $2.12 in 1961. The competitors' additional operating cost would raise their total cost above $2.13. In 1961, 30% of the records sold by the Club were produced under these licensing agreements.

While the number of companies that have entered the business of manufacturing records has grown substantially during the 1950s and early 1960s, the number of entries into the club market has been small. According to the evidence presented to the Commission, aside from the entry of R.C.A. and Capitol after 1955, there have been no significant entries into the club business. However, after the examiner closed the hearings, Record Club of America, Longine, Dot and Starday have all entered the club business with the Record Club of Amer-

3.

| COSTS | AMOUNT |
|---|---|
| Acquisition costs | |

| | |
|---|---|
| Manufacturing cost | $0.428 |
| Royalties to licensors | .178 |
| Copyright royalties | .137 |
| AFM fees [union fees] | .024 |
| Excise tax | .108 |
| Total | $0.875 |

Other costs

| | |
|---|---|
| Free merchandise (brushes, racks, etc.) used in enrollment offers .... | .123 |
| Advertising costs: includes magazine advertising; newspaper advertising; direct mail advertising (including postage); get a friend advertising; radio support, and other miscellaneous advertising expenditures to acquire new members for the Club | .353 |
| Sales promotion: includes creating and printing of monthly magazines and special promotion magazines; postage to mail the magazines; postage to mail monthly statements of account to members; supply costs connected with the mailing of various materials to members ......... | .172 |
| Other operating and distribution expenses: includes operating and warehousing, payroll costs; allocated employment benefits, including pension expense, payroll taxes, compensation insurance, group insurance, hospitalization, stock purchase plan; leased equipment expense, primarily IBM electric accounting machines and computer equipment; facilities expenses, which includes rent, depreciation of owned buildings, power, heat, maintenance, guard service, personnel and purchasing; internal supplies used in the operation of the business which do not go to record club members, e. g., approximately two hundred thousand IBM cards, computer tapes, pencils, papers, pens; other items including depreciation of furniture and owned equipment, meal allowances, travel and business meeting expenses, outside services, etc. Also included in these expenses are postage for shipping records to members as well as mailing cartons for shipping the records and depreciation for special-purpose packaging equipment ................................... | .289 |
| Bad debts: includes the accounts written off to the Reserve for Bad Debts including commissions paid to external collection agencies on accounts turned over to them; accounts in the hands of collection agencies which had not been written off to the Reserve for Bad Debts, less estimated collections, after commissions, from the collection agencies; estimated additional bad debts to be turned over to collection agencies less a provision for collection of a percentage from such accounts by external collection agencies ............................................... | .318 |
| Total | $2.13 |

ica claiming to be the second largest club in the industry.[4]

The Commission, in reversing the hearing examiner, found that the exclusive licensing agreements violated Section 5 of the Federal Trade Commission Act in that the exclusive provision of the contract had the effect of barring new entrants into the record club market and that the artist royalty agreements constituted a form of price fixing which is also violative of Section 5. The Commission entered a cease and desist order prohibiting exclusive licensing agreements and agreements fixing artist royalty payments.

To determine whether the exclusive licensing provision is an unfair method of competition under Section 5 of the Federal Trade Commission Act, the relevant market within which to measure the effect on competition must be defined. The relevant product market is the area of effective competition. The area of effective competition depends on the degree of substitutability which may be measured by the cross-elasticity of demand. CBS argues that since all records are the same whether distributed through retail dealers or mail order sellers because artists record the same material on both LPs and singles, there is complete interchangeability and, therefore, the relevant market is the entire record market. However, the Supreme Court in United States v. Philadelphia National Bank, 374 U.S. 321, 356–357, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), found that commercial banking as compared to other forms of banking was a separate market even though other financial institutions offered the same services. In Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed. 2d 510 (1962), the Supreme Court concluded that while

The other boundaries of a product market are determined by the reason-

able interchangeability of use * * *, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. * * *

The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

The Commission found that the record club market had "sufficient peculiar characteristics," United States v. E. I. DuPont de Nemours & Co., 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), to make it a submarket. The Commission based its finding of a separate submarket on three factors: 1) Columbia by its own acts treated the club market as being separate; 2) differences in demand; and 3) differences in cost.

Columbia's recognition of a separate club market came in 1955. In that year, other mail order sellers from outside the record industry threatened to apply their distribution system to the sale of records. Fearful of competition, Columbia decided to plunge headlong into the newly formed club market. In 1958, Columbia, realizing that many members were being lost because of inability to supply a wide variety of records, entered into exclusive licensing agreements with other manufacturers. Concerned that these other manufacturers might compete with Columbia in the club market, Columbia insisted on an exclusive provision in the licensing agreement which prevented these other manufacturers from selling to other clubs but did not prohibit them from selling to retailers. All of these corporate acts were directed at reducing competition in the club market and not in the industry as a whole. We agree with

---

4. On February 13, 1967, the Record Club of America petitioned to intervene in the proceedings under Section 3.9 of the Commission's Rule of Practice for Ad-

judicative Proceedings. Complaint counsel and CBS opposed intervention and the Commission denied the motion.

the Commission that Columbia itself through its actions has recognized the club form of distribution as a separate market in which to compete.

■ The Commission's characterization of the demand function in the club distribution channel is supported by substantial evidence. The Commission found that the demand function in the club market was different from the demand function in the record market as a whole. The characteristics of purchasers in the club market (members) are distinct. A club member is one who prefers to sit at home and select records rather than make many trips to the store; wants guidance in repertoire selection; seeks economical values; and is willing to accept the disadvantages of club membership such as long waiting periods for delivery, limited selection and a contractual commitment as to the number of purchases. While a record club member may purchase certain records from a dealer, the Commission's findings as to the special characteristics of a club member are not clearly erroneous.

Price differentiation is a factor in defining a submarket. See United States v. Aluminum Company of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964). Here, price has more significance in the first year membership when the price of records purchased through the record club is $2.37 and the average price for records purchased through a dealer is $2.98. In the second year of membership, price drops out as an important factor since the price differential is only 10¢ per record and the peculiar characteristics of the customer become more important in determining the boundaries of the submarket. See Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The prices of the Club are in direct competition with the prices of other clubs, and since there is at least a six-month time lag from the date of the decision as to the final contents of the bonus offer until it appears in advertisements, price competition between retailers and clubs is minimal.

We agree with the finding that the club form of distribution is separate from other mail order sellers. The club form requires a contractual commitment and attracts members by the use of the bonus type of offer. In mail order selling there is no commitment to make further purchases and the music is usually of a very specialized nature. The characteristics of the customers who purchase from mail order sellers are different from those who buy through clubs.

We fail to find any real significance in the Commission's findings as to differences in cost structure. The Commission found that the cost structure of the Club is different. In acquiring records from licensors the Club pays 87.5¢ while another club would have to pay at least $1.60 to acquire the same record from a distributor. Evidence of the Club's advantage over other clubs is its willingness to commit itself to fulfilling substantial guarantees. However, such evidence would only support a finding that the Club enjoys a competitive advantage over other clubs and not that the clubs constitute a separate submarket.

The Commission also claimed that differences in cost between the Club and retailers was further evidence of separate markets. While the Club paid a licensor 87.5¢ for a record, a dealer had to pay at least $1.60 for the same recording. The Commission's finding that the Club pays less than a retailer for the same record supports a conclusion as to the benefits of vertical integration but does not support a finding of separate markets.

We agree with the Commission in its application of the Brown Shoe test to the record industry. While all record sales constitute an industry-wide product market, within this market the record clubs constitute a "well-defined submarket."

The Commission found that the exclusive licensing agreements coupled with the fact that the Big Three record companies were integrated had the same effect as a horizontal merger between the Club and the licensors, and

[F]alls squarely within the rule of *Philadelphia Nat'l Bank* against a consolidation that "produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market. * * *" United States v. Philadelphia National Bank, 374 U.S. 321, 363 [83 S.Ct. 1715, 10 L.Ed.2d 915] (1963). Columbia Broadcasting System, Inc., FTC Dkt. No. 8512 (July 25, 1967) Slip Opinion p. 12.

The Commission, while alluding to the possible violation of Robinson-Patman standards, decided to rely strictly on merger law:

> Since the price differential (87.5¢ vs. $1.60) has allowed into the club market no significant competitors other than the integrated "big three" and has thus given the Columbia Record Club a virtual monopoly on the sale of the records of these nine firms through clubs, we think the situation should be evaluated primarily in terms of merger standards. Id. 11 n. 29.

CBS complains that the Commission's reliance on a per se horizontal merger standard is misplaced. Rather, the exclusive provision is ancillary to the licensing agreement and must be sustained if it is reasonable. United States v. Addyston Pipe and Steel Co., 85 F. 271 (6th Cir. 1898), affirmed, 175 U.S. 211, 241, 20 S.Ct. 96, 44 L.Ed. 136 (1899). In Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418 (1957), cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957), the court did not adopt a per se approach in upholding the validity of an exclusive dealership agreement initiated by the dealer, and CBS believes that the present case is on all fours with *Packard*. Too, CBS contends that since the "merger" is a short term contractual arrangement and not permanent, a different standard must be applied.

The characterization of the relation between Columbia and the licensors as a horizontal merger between the Club and the licensors is not in tune with the reality of the situation. Columbia, the manufacture, and the licensors have entered into an agreement to supply the Club with outside labels. In this light, we categorize the relation as in the nature of a horizontal merger with the effects of a vertical merger. In the field of horizontal mergers the Supreme Court has been influenced by concentration and trends in concentration and has not concerned itself with ease of entry. Here, the effect of the exclusive licensing agreement is to foreclose a competitor or prospective competitor of the Club from a segment of the total record manufacturing market which would otherwise be open to him. The Big Three account for 48% of the total record sales and Columbia's licensors represent another 11.1% of this market. Together, almost 60% of the record sales market is foreclosed from new club entrants.[5] In this context, the problem here is different from that presented in United States v. Columbia Pictures Corp., 189 F.Supp. 153 (S.D.N.Y., 1960), where there was no barrier to entry and the agreement was viewed as a horizontal merger. Kessler and Stern, Competition, Contract and Vertical Integration, 69 Yale L.J. 1, 77 n. 353 (1959).

The Supreme Court in analyzing vertical mergers has looked to the extent of foreclosure and its relation to the structure of the market. In Standard Oil Co. of California v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), and F. T. C. v. Motion Picture Advertising Serv. Co., 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953), the Court held that the standard of legality is determined by the degree of market foreclosure. However, in Brown Shoe v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Court said that "in cases * * * in which the foreclosure is neither of monopoly nor *de minimis* proportions, the percentage of the market foreclosed by the vertical arrangement can-

---

5. The sales figures are a measure of production and the degree of market acceptance.

not itself be decisive." 370 U.S. at 329, 82 S.Ct. at 1526. "*Only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger.*" 370 U.S. at 322 n. 38, 82 S.Ct. at 1522.

CBS contends that while a portion of the market may be foreclosed from other record clubs, the effect on competition is minimal because of the short term nature of the agreement coupled with the overall market structure. CBS relies on United States v. Philadelphia Nat'l Bank, 374 U. S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), where the Court stated that "integration by merger is more suspect than integration by contract, because of the greater permanence of the former." 374 U.S. at 366, 83 S.Ct. at 1743. In F. T. C. v. Motion Picture Advertising Serv. Co., 344 U.S. 392, 73 S.Ct. 361 (1953), the Commission found that exclusive contracts of five years unreasonably restrained competition and that the company could not enter any agreements for longer than a year. In upholding the Commission's order, the Court said, "The precise impact of a particular practice on the trade is for the Commission, not the courts, to determine. The point where a method of competition becomes 'unfair' within the meaning of the Act will often turn on the exigencies of a particular situation, trade practices, or the practical requirements of the business in question." 344 U.S. at 396, 73 S.Ct. at 364. Columbia just like Motion Picture Advertising is entering into short term exclusive licensing contracts in order "to bolster horizontal power." Kessler and Stern, 69 Yale L.J. at 56, and we agree with the Commission that the short term nature of the agreements does not lessen their anticompetitive effect.

CBS relies heavily on Doubleday and Co., Inc., 50 F.T.C. 263 (1953). *Doubleday* involved licensing agreements between a publisher and a non-integrated book club whereby the book club was given an exclusive right to publish and sell "book club editions." Under the exclusive licensing agreement, a book club was able to offer the book at a substantially lower price than retailers. The complaint contended that the failure to grant the same rights to retailers as it gave to book clubs violated Section 5. The Commission held that the increased competition between retailers and book clubs that resulted from such agreements did not violate Section 5. Here, the situation is entirely different because we are concerned with competition between record clubs rather than competition between clubs and retailers. The exclusive agreements coupled with the fact that the large record manufacturing companies are integrated prevent other record clubs from forming and, thereby, reduce competition in the record club market. The *Doubleday* case is clearly distinguishable.

■ While we agree with the Commission that Columbia's licensing agreements have foreclosed a share of the market, we feel that the Commission has failed sufficiently to examine the market structure. It is true that the record club market is the relevant market within which to measure the effect on competition. However, this market itself has undergone a significant change since the hearing examiner completed his hearings and entered his findings. Since 1963, there have been at least four new entrants into the record club market. One of these, the Record Club of America, now claims to be the second largest record club in the industry. The Commission's assumption that "the price differential * * * has allowed into the club market no significant competitors other than the integrated 'big three'", Columbia Broadcasting System, Inc., FTC Dkt. No. 8512 (July 25, 1967) Slip Opinion p. 11 n. 29, does not seem to be true. Too, the consumer tastes have undergone a substantial change and with this, the entire record industry. Many of the new "hit" recording stars have cut their records on the labels of small manufacturers. As a result, the size and nature of the foreclosure may have changed. The

Commission's investigation of Columbia's practices began in 1959 and the complaint was filed in 1962. Much of the evidence in the record pertains to the years 1960 and 1961. The Commission did not hand down its opinion until July of 1967. We are of the opinion that because of the long delay in deciding this case and the substantial allegations of changes in the structure of the entire industry, and especially the club market, this case must be remanded to the Commission for further evidence as to the present structure of the record club market in order to determine whether supplies of records have been foreclosed from other clubs and whether such foreclosure has significantly prevented new entrants into the market.

■■ CBS also attacks that portion of the cease and desist order which is directed at the fixing of artist royalties. CBS claims that since provisions fixing royalties have been deleted from all contracts, the Commission may not enter a cease and desist order. It is fundamental to the powers of the Commission that it have wide discretion in implementing its decisions. We do not think that the use of a cease and desist order in this situation was an abuse of discretion. Spiegel, Inc. v. F. T. C., 411 F.2d 481 (7th Cir. June 11, 1969).

■ CBS contends that Commissioner MacIntyre should have disqualified himself from participation in this case because of Commissioner MacIntyre's involvement in the *Doubleday* litigation, 50 F.T.C. 263 (1953), when he was a staff member of the Commission. The Administrative Procedure Act provides:

> An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision. 5 U.S.C. § 554(d).

It will be remembered that *Doubleday* involved agreements between a publisher and a book club in which a book club was given the exclusive right to publish and sell "book club editions." The fact that *Doubleday* involves book clubs and this case involves record clubs does not make the two "factually related" as this phrase is used in the A.P.A. Too, we do not believe MacIntyre's participation violated due process.

We reverse and remand this case to the Commission for further proceedings as to the structure of the record club market consistent with this opinion. In all other matters, we affirm.

Affirmed in part, reversed in part, and remanded.

KILEY, Circuit Judge (dissenting).

I dissent from the court's judgment. The court's opinion approves the Commission's determination of the relevant market, a record club market separate from the general record market. It also approves the finding that the exclusive license agreements effectively foreclose a prospective competitor from a market otherwise open to him, and decides that the short terms of the agreements do not lessen their anti-competitive effect. But the court's judgment nevertheless sets the Commission's order aside. The essential reason given is that the Commission's order is stale. In the court's view, significant and substantial changes have taken place in the market since the hearing examiner completed his hearings and entered his findings, and further evidence is needed because the Commissioner did not sufficiently examine the market structure and at least four new entrants have come into the market since 1963, including the Record Club of America which claims to be the second largest club in the industry.

I am afraid that by the time the market structure is sufficiently examined, further evidence gathered, complaint amended, hearing examiner's decision filed and the Commission's order entered,

several years from now, the market will probably have undergone further significant and substantial changes. A petition for review filed then will speak again of an order unrelated to conditions of the current market.

The Commission's decision covered petitioner's practices principally in 1960 and 1961. The court agrees that the Commission properly decided that at that time there was a violation of Sec. 5 of the Act. It is unfortunate of course that in this area there is a perplexing time lag between complaint and order. But the record consists of more than 11,000 pages of testimony and over 1,400 exhibits. A similar perplexity arises for the same reason in anti-trust cases where large companies and a large government are contestants. The situation does not seem to improve as time goes on, but rather to grow worse. The indication seems to be that the evils of the delays inhere in the nature of our legal system and economy, and are "fleas that come with the dog."

I think that if there are changes in the market which render the Commission's order unrealistic vis-a-vis the market. after 1962, and changed circumstances require modification of the order, the appropriate procedure is to affirm it, as I think the court should do. If petitioners thereafter wish to achieve a modification, they should have the burden of showing before the Commission that justice requires modification in view of the changed market conditions. The Commission has the power to modify the order under that procedure should it decide to do so. See 15 U.S.C. § 45(b); American Chain & Cable Co. v. FTC, 142 F.2d 909 (4th Cir. 1944). See also International Union of Mine etc. Workers v. Eagle-Pitcher Co., 325 U.S. 335, 342, 65 S.Ct. 1166, 89 L.Ed. 1649, where American Chain is discussed with approval.

I would affirm the Commission's order.