IIT, an International Investment Trust, and Georges Baden, Jacques Delvaux and Ernest Lecuit, as Liquidators for IIT, an International Investment Trust, Plaintiffs,

v.

Bernard CORNFELD, Carl Johan Bernadotte, Martin Brooke, C. Henry Buhl, III, Joop Melse, Erich Mende, Bert Notz, Pierre Rinfret, James Roosevelt, Melvin Rosen, Barry Sterling, Moritz von Hessen, Henry von Maur, Arthur Lipper Corporation, Arthur Lipper, III, Arthur Andersen & Co., James E. Bye, Stanley B. Hallman, James B. Kuhn, Lawrence Ocrant, E. Keene Wolcott, Adams & Peck, Bear, Stearns & Co., Burnham and Company, Emanuel Deetjen & Co., Irving Lundborg & Co., Burnham & Company, Incorporated, Drexel Burnham & Co., Inc. and Does 1 through 10, Defendants.

75 Civ. 3514 (GLG).

United States District Court,
S. D. New York.

Dec. 6, 1978.

As Amended Dec. 7, 1978.

Anderson, Russell, Kill & Olick, P. C., New York City, for plaintiffs by Eugene R. Anderson, Neal J. Morse, New York City, of counsel.

Breed, Abbott & Morgan, New York City by Edward J. Ross, James R. Peterson, New York City, of counsel, Wilson & McIlvaine, Chicago, Ill. by Charles W. Boand, Chicago, Ill., of counsel for defendant, Arthur Andersen & Co.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendants, Bear, Stearns & Co., Adams & Peck, Burnham & Co., Burnham & Co., Inc., and Drexel Burnham & Co., Inc. by Stephen A. Weiner, Robert J. Sussman, Stanley D. Davis, New York City, of counsel.

DiFalco, Field & Lomenzo, New York City, for defendants, Arthur Lipper Corp. and Arthur Lipper, III by Howard S. Klotz, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

This securities case raises novel questions about derivative actions under section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and Rule

10b–5, 15 C.F.R. § 240.10b–5, and subject matter jurisdiction under the federal securities laws. The case presents the general issue whether, or to what extent, foreign shareholders in foreign corporations may assert, in a United States court, 10b–5 fraud claims in a derivative action against their own management and alleged American co-conspirators.

The plaintiff, IIT, was an "international investment trust" organized under the law of the Grand Duchy of Luxembourg. It is now in liquidation there. The individual plaintiffs are IIT's liquidators, appointed by a Luxembourg court. The action is not the first involving IIT in this circuit and is yet one more "product of the troubled existence of Investors Overseas Services ("IOS")." *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1003 (2d Cir. 1975).

The complaint originally named sixty-eight individual and corporate defendants, all alleged to be members of one or more conspiracies to defraud IIT. Several defendants have moved to dismiss for lack of subject matter jurisdiction under Fed.R. Civ.P. 12(b)(1).[1] Defendant Arthur Andersen & Co. has also moved to dismiss, under Fed.R.Civ.P. 17, on the ground that the plaintiffs lack capacity to prosecute this action. All the moving defendants also assert that the statute of limitations bars the plaintiffs' claims.

### I.

The complaint alleges that IIT was operated under Luxembourg law much like the open-ended mutual funds common in this country.[2] Investors, virtually all of whom were foreigners residing in countries other than the United States, bought units of participation in the IIT "fund." The fund

---

[1] The moving defendants are Arthur Andersen & Co.; Bear, Stearns & Co., Adams & Peck, Burnham & Co., and its successors Burnham & Co., Inc., and Drexel Burnham & Co.; and Arthur Lipper III and Arthur Lipper Corp. In addition to the motions mentioned in the text, some of the movants have included motions to strike scandalous material under Fed.R.Civ.P. 12(f), to dismiss for failure to plead with the particularity required by Fed.R.Civ.P. 9(b), and

to require plaintiffs to post security for costs. Twenty-seven defendants who allegedly held positions in King Resources Co. have been dropped on consent of plaintiffs, and several other defendants were never served with process.

[2] Judge Friendly made the same characterization in *IIT v. Vencap,* 519 F.2d 1001, 1003 n.1 (2d Cir. 1975).

was managed by IIT Management Co., a corporation organized under Luxembourg law and not registered in this country under the Investors Advisors Act, 15 U.S.C. §§ 80b–1 to 80b–21. IIT Management was in turn controlled by its parent, IOS, Ltd., first a Panamanian and then a Canadian corporation, made somewhat infamous by Bernard Cornfeld and later by Robert Vesco.[3]

■ IIT Management, although incorporated in Luxembourg, was based primarily in Geneva, Switzerland.[4] As a result of a 1967 consent order of the Securities and Exchange Commission ("SEC"), IOS agreed not to sell shares in IIT to Americans. It appears that currently there remain about 144,496 fundholders of IIT, who reside in 154 different countries. Apparently 218 of the fundholders now reside in the United States.[5] In its heyday, during the late 1960's and early 1970's, IIT's assets totalled in the hundreds of millions of dollars, and IIT Management invested IIT funds in securities from all over the world, including substantial amounts in American securities.[6]

The complaint is a general attack on the relations between IIT and an American entrepreneur named John King. King allegedly controlled a group of American corporations operating principally from Denver, Colorado. This King group included King Resources, Inc., a publicly traded Maine corporation headquartered in Denver, the Colorado Corp., a private company incorporated under the law of Colorado, and various subsidiaries of both. In addition, King Resources also allegedly controlled a Netherlands Antilles subsidiary called King Resources Capital Corp. ("KRCC").

The complaint alleges generally a massive conspiracy among the "King complex," IOS and IIT Management to defraud the fundholders of IIT. The allegations, although flagrantly verbose,[7] center on three series of acquisitions by IIT of King-related securities.

The first was a series of purchases of "eurodollar" convertible debentures issued by KRCC, the Netherlands Antilles subsidiary of King Resources. The debentures

---

3. IIT was one of the so-called "dollar funds," which included Fund of Funds, Ltd., IOS Growth Fund, Ltd. and Venture Fund International. The rise and fall of the IOS complex and Mr. Cornfeld's participation are memorialized by several actions in this circuit, some decided and some still pending.

4. To some extent, the plaintiffs have supplemented the complaint's factual allegations in several memoranda submitted on the motions. The Court will consider these supplemental allegations well-pleaded for purposes of the motions and, of course, must consider the factual allegations true for purposes of the motions to dismiss. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

5. It is unclear whether some of these 218 fundholders are United States citizens, but one explanation offered for the existence of a few American fundholders is that they could be servicemen who somehow purchased units of IIT while stationed overseas. In any event, even if all the 218 fundholders *are* Americans, they constitute approximately .15 percent of the total.

6. For example, the IIT Annual Report for 1970 lists investments costing a total of $375,278,-300, with investments in United States securi-

ties accounting for $149,282,900. The remainder was invested virtually all over the world.

The fund was valued on a daily basis in United States dollars, and the management fees paid to IIT Management were based on the valuations of the fund's assets. Units in the fund were redeemable on a book value basis at the will of the fundholder, and a formal document entitled IIT Fund Regulations governed the relationship between fundholders and IIT Management Co.

7. Although the complaint centers on these transactions, it does not refrain from making totally unrelated allegations of the "incestuous" relationship between Cornfeld and King. In fact, the plaintiffs' mountainous submissions have consistently attempted to overwhelm the Court with tales of gigantic fraud schemes, including one story about a "world-wide King-IOS partnership [designed] to dominate the natural resources of virtually the whole world." (Plaintiffs' Memorandum in Opposition, at 13.) In *IIT v. Vencap*, 519 F.2d at 1011 n.17, the court characterized plaintiffs' counsel as inclined to assemble "a mass of accusations, liberally larded with references to Vesco [and IOS's "colossal" fraud] without analysis of their legal significance." The papers from the same plaintiffs' counsel in this case follow in that vein.

were issued in November, 1968, by KRCC, in a foreign offering outside of the United States, and they were guaranteed by King Resources, the American parent. Because they were issued by the foreign subsidiary of King Resources and offered only outside the United States, "no action" treatment was requested and received from the SEC, and the offering was not registered under the Securities Act of 1933 (the "1933 Act"). The eurodollar debenture offering, however, was made at the same time as a domestic offering of King Resources common stock which was registered under the 1933 Act. The complaint alleges that IIT bought approximately $8 million worth of the eurodollar debentures in the "aftermarket," i. e., not directly on the offering but during a six-month period following the offering. These purchases were made in Europe through European brokers.

Next, the complaint states that, during the same approximate time period, IIT was caused to invest in the common stock of King Resources, ultimately in an amount in excess of $14 million. King Resources common was traded on the over-the-counter market in the United States, and these purchases were executed in this country. Plaintiffs allege that IIT's losses on the eurodollar debentures and King Resources common stock eventually amounted to over $22 million.

The third challenged transaction is a $12 million loan from IIT to the Colorado Corp., a privately owned American corporation allegedly controlled by King. The complaint alleges that in July of 1969, the IIT Management defendants caused IIT to purchase a convertible note in that sum from the Colorado Corp., which was never intended to be, and was not in fact, repaid to IIT.

As alleged more substantially in one of the plaintiffs' memoranda, the *quid pro quo* for the IIT Management principals in these King-related acquisitions included personal kickbacks, special opportunities for tax avoidance schemes involving various King Resources properties, and the ability to overvalue some of the King assets in the IIT portfolio so as to increase the management fee paid by the fund to IIT Management. The complaint alleges that all of the principals in IIT Management were involved in these fraudulent transactions by which they effectively stole money from the fund. The directors of IIT Management Co. included both Americans and foreign citizens. Of the six IIT Management principals who allegedly had direct responsibility for IIT's investments, two are alleged to be citizens of foreign countries.

The roles of the non-IIT Management defendants were allegedly those of aiders and abettors and co-conspirators. In connection with both the purchases of the eurodollar debentures and of King Resources common, the complaint alleges that virtually all the major documents involved were false and misleading. Plaintiffs focus especially on the prospectus used in the KRCC foreign offering, and allege that it misstated drastically the financial picture of King Resources (the American guarantor). Because IIT Management was allegedly involved completely in the fraud and hence cannot be described as being deceived, the complaint states that IIT either "relied upon the [misleading] prospectus   .   .   . or,   .   .   . the defendants are estopped from denying such reliance." Defendant Arthur Andersen, the accountants for King Resources and IIT, allegedly certified false financial statements of King Resources and provided misleading "comfort letters" to the underwriters involved in the European offering at the closing of the agreement among underwriters in London.

Defendants Bear, Stearns & Co., Adams & Peck and Burnham & Co. and its successors (the "underwriter defendants") were lower-bracket underwriters in the eurodollar debenture offering.[8] Although it is unclear how these defendants allegedly participated in the purchases of King Resources common and the loan to the Colorado Corp.,

---

8. The underwriter defendants apparently had a total participation of $600,000 out of the $15 million face value of the offering.

plaintiffs do allege that they knew of the misleading character of the eurodollar prospectus and aided in the scheme to have IIT buy large amounts after the offering. The lead and co-managing underwriter for the foreign offering, however, was Investors Bank Luxembourg, S. A., itself a Luxembourg investment bank alleged to have been a subsidiary of IOS and directly controlled by Cornfeld and the other IOS principals.

Defendants Arthur Lipper and Arthur Lipper Corp. (referred to collectively as "Lipper") are described as the securities brokers for IIT during the period embraced by the complaint. The plaintiffs allege that through Lipper's brokerage work for IIT and the other "dollar funds" [9] he became intimately aware of the dealings of the IIT Management insiders, as well as the King principals. Through an elaborate communications mechanism, which began in Switzerland and traveled through London and Canada to the United States, Lipper executed the orders for King Resources common stock placed by IIT. In addition, Lipper is said to have participated in the negotiations regarding the $12 million "loan" to the Colorado Corp. and to have received for his efforts improper options to purchase stock in the Colorado Corp. at depressed prices. The complaint also alleges that as a result of his efforts to bring IIT and the King group together, he was given personal opportunities to invest in various King Resources projects, involving everything from jet planes to properties in the Sinai peninsula.

In essence, then, the complaint describes a massive conspiracy through which the IOS defendants including IIT Management diverted monies from the fund for their personal benefit. John King and his group of companies were allegedly the primary vehicle by which the fraud was perpetrated.[10] The Lipper defendants, Arthur Andersen and the underwriter defendants all allegedly aided and abetted the scheme by giving substantial assistance to IIT Management with knowledge of the true nature of the acquisitions being made for the fund by IIT Management. As a result of the losses allegedly suffered by IIT on its various acquisitions, the complaint requests almost $35 million in compensatory damages and another $35 million in punitive damages.

## II.

Defendant Arthur Andersen raises the threshold issue of plaintiffs' capacity to prosecute this action. The attack under Fed.R.Civ.P. 17(b) [11] is two-pronged. First, Andersen contends that IIT, as an "indivision organisée" under Luxembourg law, was merely a legal form of joint ownership which has no legal identity or capacity under Luxembourg law. Second, Andersen asserts that the Luxembourg proceedings that led to the appointment of the three liquidators of IIT should not be recognized here under principles of international comity.

9. *See* note 3 *supra.*

10. King was later the subject of criminal prosecution in this district for certain dealings with another of the IOS funds, Fund of Funds, and his conviction was affirmed. *United States v. King,* 560 F.2d 122 (2d Cir.), *cert. denied,* 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977). King, King Resources, KRCC and The Colorado Corp. are not named as defendants here because of stays issued in bankruptcy proceedings involving them.

11. Rule 17(b) provides:
"Capacity to Sue or Be Sued. The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of his domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States, and (2) that the capacity of a receiver appointed by a court of the United States to sue or be sued in a court of the United States is governed by Title 28, U.S.C. §§ 754 and 959(a)."

On the first prong of the attack, Andersen has submitted substantial papers analyzing the legal status of IIT under Luxembourg law.[12] Andersen's argument is that IIT's status under Luxembourg law was that of a piece of jointly owned property, which is comparable to a piece of real estate or other property jointly owned in our legal system. The structure was not formally authorized by Luxembourg statute, but rather was established under general principles of property ownership derived from France, Belgium and other civil law countries. As Andersen describes it, this judicial "nonentity," like a tract of jointly owned real property in our country, could not sue or be sued in its own name, or act for itself in any manner under Luxembourg law.[13] Rather, all legal and business actions involving the fund were undertaken by IIT Management Co., which had the legal authority under Luxembourg law and the IIT Fund Regulations, to do so.[14] The fund itself, however, viewed as a piece of property, i. e., as a stock portfolio, had no identifiable legal personality and was not considered a corporate entity of its own under the law of Luxembourg.

The plaintiffs argue in response that although not a statutorily recognized corporate body, IIT's legal personality was established implicitly, in a *de facto* manner, by Luxembourg practice. Plaintiffs, for instance, point to an apparent recognition by Luxembourg authorities of IIT as a taxable entity separate from the management company. Neither plaintiffs nor Andersen however, has pointed to any Luxembourg judicial authority directly on point on the question whether IIT, or another mutual fund indivision, could sue or be sued in its own name. But despite an extended debate on some of the more esoteric aspects of Luxembourg law, it seems clear that the legal identity of the fund itself is no longer the real issue involved in the capacity question in this Court. The overriding issue, in the present posture of the case, is the capacity of the liquidators, appointed by a Luxembourg court, to sue on behalf of the fund. On this issue, the factual background of the liquidation proceedings in Luxembourg must be briefly considered.

In November, 1972, the SEC filed a complaint against Robert Vesco (the successor to Cornfeld) and forty-one other defendants, alleging that he was effectively looting the assets of the IOS funds, including IIT. *See SEC v. Vesco,* 72 Civ. 5001 (S.D. N.Y., filed Nov. 27, 1972). This was the beginning of widespread publicity regarding the IOS complex. Undoubtedly at least in part induced by the growing scandal, Luxembourg's Grand Duke issued the Grand Ducal Decree of December 22, 1972, which submitted Luxembourg investment funds to the supervision of that country's Bank Control Commissioner. In June, 1973, after further disclosures had been made, a meeting of securities officials from the SEC, Luxembourg, Germany, and Canada and a representative of the International Association of Shareholders of IOS Funds ("IASIF") was held in Luxembourg. The

12. Much of the evidence submitted on Luxembourg law comes from the deposition of Georges Baden, one of the individual plaintiffs and himself an acknowledged expert on the subject. As to the Court's ability to investigate foreign law as a question of law, see Fed.R.Civ.P. 44.1; Miller, *Federal Rule 44.1 and the "Fact" Approach to Determining Foreign Law: Death Knell for a Die-Hard Doctrine,* 65 Mich.L.Rev. 613 (1965).

13. Andersen quotes from Elvinger & Hoss, 56A *Cahiers de Droit Fiscal International* II/185 (1971):

"[T]he investment fund [is] an undivided co-ownership of assets, [and] does not constitute a legal entity and is managed by a man-agement company under the supervision of a depositary bank. . . ."

The authors also make it clear that there is no positive law in Luxembourg explicitly authorizing the creation of a Luxembourg investment fund, but rather that such funds are "creations of practice." *Id. See also The Luxembourg Tax Service,* published for members of the Foreign Tax Law Association, at 35 (rev. ed. 1971); B. Delvaux, *Les Societes "Holding" au Grand-Duche de Luxembourg* 34–35 (1969); M. Planiol, *Treatise on the Civil Law,* vol. 2, part 2 (1939).

14. There apparently was explicit statutory authority under Luxembourg law for the creation of a corporation capable of managing the assets of an indivision organisée.

parties at that meeting decided to attempt to petition for the liquidation of the various IOS funds in their domicile countries.

While Luxembourg proceedings involving IIT were pending, the Luxembourg district court declared IIT Management Co. bankrupt on August 1, 1973. On December 18, 1973, upon the petition of the Bank Control Commissioner, the court declared IIT in involuntary liquidation and appointed the three individual plaintiffs here as liquidators.[15]

Arthur Andersen, the first litigant in this country to mount a full attack on the capacity of the liquidators,[16] now challenges the procedural due process of the Luxembourg proceedings which led to their appointment. Andersen asserts that because the Luxembourg proceeding was "ex parte," with no formal notice to IIT fundholders, and in violation of the IIT Fund Regulations, it should not be recognized here under principles of international comity.

■ In support of its argument, Andersen cites a host of cases dealing with attempts by foreign states to assert control over property located outside of their jurisdictions, none of which is apposite.[17] The decree of December 18, 1973, did not purport to control or alter IIT assets located in other nations. Rather, it merely placed the fund, itself a Luxembourg entity under any view, in liquidation and appointed the liquidators to represent it, authorizing them to "institute and support all proceedings and suits before any court of law in the Grand Duchy of Luxembourg or abroad." Further, after the capacity of the liquidators was challenged in this action, the Luxem-

bourg court issued a second, "interpretive" decree of October 17, 1977, stating that the "liquidators act as the proxies and representatives of the investors considered as principals . . . ." Clearly, whatever voluntary liquidation procedures that were contemplated by the fund's regulations were superceded under Luxembourg law by the involuntary petition of the Bank Control Commissioner and the decrees of the Luxembourg court. Accordingly, there can be no doubt that under Luxembourg law, the liquidators are now the legal representatives of the fund and are authorized to sue and be sued in its name.

■ Andersen, however, continues to attack the underlying procedural technicalities of the liquidation proceedings in an effort to show that they did not comport with American notions of due process. The proceedings, of course, were regular on their face under Luxembourg law, and the plaintiffs now have two Grand Ducal Decrees to support their position. Moreover, after all its arguments on the technical niceties of Luxembourg practice, Andersen has not offered any good practical reason why the liquidators should not be recognized here. Andersen, for instance, makes much of the lack of formal notice to the fundholders regarding liquidation. Under Luxembourg law, such formal notice was apparently not required in the case of such an emergency, involuntary liquidation. Further, it appears that through various commercial publications in Europe and elsewhere, some notification of the IIT liquidation was given to the international financial

---

15. Fund of Funds and IOS Growth Fund had been placed in liquidation in Canada on August 1, 1973.

16. The point was apparently not raised in *IIT v. Vencap*, 519 F.2d 1001 (2d Cir. 1975). The trustee of King Resources Co. did challenge the capacity of the liquidators in the bankruptcy proceeding involving the Colorado Corp., but in the context of the Bankruptcy Act, the Tenth Circuit overruled the challenge. *IIT v. Lam*, 531 F.2d 463 (10th Cir. 1976). The capacity of the liquidators was explicitly recognized by a consent order filed in *SEC v. Vesco*, 72 Civ. 5001 (S.D.N.Y. April 4, 1974).

17. *See e. g., Tabacalera Severiano Jorge, S. A. v. Standard Cigar Co.*, 392 F.2d 706 (5th Cir.), cert. denied, 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968); *Republic of Iraq v. First National City Bank*, 353 F.2d 47 (2d Cir. 1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966); *Zwack v. Kraus Bros. & Co.*, 237 F.2d 255 (2d Cir. 1956). *See also Maltina Corp. v. Cawy Bottling Co.*, 462 F.2d 1021 (5th Cir.), cert. denied, 409 U.S. 1060, 93 S.Ct. 555, 34 L.Ed.2d 512 (1972).

community. In addition, the director of IASIF, the closest thing to an independent association of IIT fundholders, was present at the meeting of international regulators in Luxembourg in 1973, and he apparently expressed approval of the plan to liquidate IIT in Luxembourg. Finally, Andersen has been unable to point to even a single objection to the IIT liquidation made by any of the numerous fundholders in any of the 154 countries where they now reside. Presumably, a fundholder who objected to the manner in which the liquidators were carrying out the liquidation could apply to the Luxembourg court for some kind of relief or modification of its liquidation decrees. There is no evidence that any fundholder has taken such action.

Under these circumstances, there is nothing in the doctrine of comity which would argue for looking behind the Luxembourg decrees, or support nonrecognition of the liquidators by this Court. Indeed, comity and practical sense require recognition. *See generally Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895). Recognition of the liquidators would not interfere with American policy or impair the right of American citizens. *See Mabon v. Ongley Electric Co.*, 156 N.Y. 196, 201, 50 N.E. 805 (1898). From a practical standpoint, recognition is a necessity if the liquidators are to continue in their difficult task of recouping the assets of the fund that may exist in countries all over the world, and their efforts to recover the assets of a

worldwide community of investors is manifestly "consistent" with the general policy of the United States. *See generally* Restatement (Second) of Foreign Relations Law of the United States, § 43 (1965). For these reasons, the capacity of the liquidators to represent the fund, as explicitly authorized by the Luxembourg court, will be recognized in the instant action.

### III.

The more difficult question, of course, is whether this Court has subject matter jurisdiction to apply the federal securities laws to the transactions alleged in the complaint. The analysis requires a brief discussion of the principles of subject matter jurisdiction in general, the theory of the plaintiffs' complaint, and how the principles apply in the instant case.

#### A. *Subject Matter Jurisdiction—In General*

The plaintiffs' complaint asserts jurisdiction on several grounds, only one of which arguably grants jurisdiction.[18] Section 27 of the 1934 Act, 15 U.S.C. § 78aa, gives jurisdiction to district courts exclusively for all actions "brought to enforce any liability or duty created by this title or the rules and regulations thereunder." Because the complaint, as discussed *infra,* distills to a claim under Rule 10b–5, and because the SEC has done little to delineate by regulation the extent of the territorial reach of Rule 10b–5,[19] the Court is required essentially to de-

---

**18.** In addition to jurisdiction based on the 1934 Act, the complaint alleges jurisdiction on § 214 of the Investment Advisors Act, 15 U.S.C. § 80b–14, as well as § 22(a) of the 1933 Act, 15 U.S.C. § 77v(a). Since the plaintiffs have never alleged that either of these sections is any broader in scope than § 10(b) of the 1934 Act and its jurisdictional counterpart, these additional jurisdictional provisions add nothing.

The complaint also claims jurisdiction based on 28 U.S.C. §§ 1337 and 1350, dealing with actions arising under laws regulating commerce and actions by aliens for torts committed in violation of international law. Both of these jurisdictional contentions were adversely disposed of by Judge Friendly in *IIT v. Vencap,* 519 F.2d at 1015. There is no allegation of diversity of citizenship under 28 U.S.C. § 1332,

and the claim of pendent jurisdiction adds nothing at this stage of the proceedings.

**19.** There is dearth of legislative history relevant to the general question of extraterritorial application of the securities laws. *See Hearings on Stock Exchange Regulation Before the House Comm. on Interstate and Foreign Commerce,* 73d Cong., 2d Sess. 115 (1934). Neither is there much specific legislative history relating to § 30(b) of the 1934 Act, 15 U.S.C. § 78dd(b), which provides:

"The provisions of this chapter or of any rule or regulation thereunder shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States, unless he transacts such business in contravention of such rules and regulations as the Commission may prescribe as

cide whether Congress would have wished the United States courts to apply the substantive provisions of the Rule to these transnational transactions. This analysis does not entail a consideration of the ultimate extent to which Congress might go in imposing a rule on activities, part of which occur in the United States, under Restatement (Second) of the Foreign Relations Law of the United States § 17 (1965), or Congress' power to impose rules on the conduct of United States nationals, under *id.* § 30, so much as an inquiry into whether in this particular case, Congress would have approved of "extraterritorial" application of the federal securities laws to the challenged transactions. *See IIT v. Vencap,* 519 F.2d at 1016; *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1334 (2d Cir. 1972).

The Second Circuit has decided several cases outlining the general contours of subject matter jurisdiction under Rule 10b–5. The first was *Schoenbaum v. Firstbrook,* 405 F.2d 200 (2d Cir.), *rev'd on other grounds,* 405 F.2d 215 (2d Cir. 1968) (en banc), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). In *Schoenbaum,* the plaintiff was an American shareholder in a Canadian corporation who brought a derivative action challenging the issuance of stock in the Canadian corporation at a depressed price to Canadian insiders. Because the corporation's stock was listed on the American Stock Exchange and held by a minority of Americans, the court upheld jurisdiction over the transaction, based in part on a theory that damage to the value of the shares would injure American minority shareholders who had pur-

chased their shares on a domestic exchange. The court stated a general principle that the Act applies "to protect domestic investors who have purchased foreign securities on American exchanges and to protect the domestic securities market from the effects of improper foreign transactions in American securities." *Id.* 405 F.2d at 206.[20]

In *Leasco Data, supra,* an American corporation was allegedly defrauded by foreigners, with some misrepresentations occurring in the United States and the sale of securities occurring in England. Assuming that the existence of some fraudulent acts by the defendants in the United States would support jurisdiction, the court went on to consider the import of the American activities, and concluded that "if Congress had thought about the point, it would . . have wished to protect [this] American investor . . . ." 468 F.2d at 1337. The court was careful, however, to point out that *Schoenbaum's* "effects" test, if taken too loosely, would result in an unwarranted expansion of the reach of Rule 10b–5:

"[T]he language of § 10(b) . . . is much too inconclusive to lead us to believe that Congress meant to impose rules governing conduct throughout the world in every instance where an American company bought or sold a security."

*Id.* at 1334.

Then, in 1975, the Second Circuit decided two cases involving a different situation— cases in which foreign plaintiffs attempted to sue American defendants involved in transnational securities transactions. In *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974 (2d Cir.) (Friendly, J.), *cert. denied,* 423

necessary or appropriate to prevent the evasion of this chapter."

Although § 30(b) might once have offered a statutory basis for a principled limitation of the extraterritorial reach of Rule 10b–5, courts have generally not afforded it such a construction, and the SEC has not undertaken any significant rulemaking to establish guidelines for the extraterritorial application of the Rule. *See* R. Jennings & H. Marsh, *Securities Regulation* 1236–40 (1977). *See generally* Note, *American Adjudication of Transnational Securities Fraud,* 89 Harv.L.Rev. 553 (1976) [hereinafter cited as Harvard Note]; Comment, *The Transnational*

*Reach of Rule 10b–5,* 121 U.Pa.L.Rev. 1363 (1973) [hereinafter cited as Penn.Note].

In the context of the instant case, *Roth v. Fund of Funds, Ltd.,* 405 F.2d 421 (2d Cir. 1968), *cert. denied,* 394 U.S. 975, 89 S.Ct. 1469, 22 L.Ed.2d 754 (1969), indicates that IIT, as a foreign mutual fund or investment trust, does not come within the language of § 30(b) since it would not qualify as engaged in a "business in securities." *Id.* at 422. The concededly American defendants do not claim to be exempt from liability under the language of § 30(b).

**20.** The holding on the merits in *Schoenbaum* is discussed under III B, *infra.*

U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975), the court addressed a purported class action on behalf of IOS shareholders who had purchased IOS stock in three related offerings. Although IOS was a foreign corporation and all the offerings were foreign and not registered under United States securities laws, some of the proposed class members were apparently Americans. Assuming that American investors could allege that a misleading prospectus was delivered to them in the United States, the court concluded that those plaintiffs could show the necessary American nexus to establish subject matter jurisdiction to apply federal law to the transactions. Responding to the plaintiffs' claim that the domestic effect of the collapse of IOS was generally sufficient to uphold jurisdiction as to all purchasers, however, the court retreated again from the broad implications of *Schoenbaum.* American purchasers who bought here and received an allegedly misleading prospectus here presented a strong case,

> "[b]ut it does not support subject matter jurisdiction [for all plaintiff purchasers] simply because in the long run there was an adverse effect on this country's general economic interests or on American security prices. Moderation is all."

*Id.* at 989. *See id.* at 990–99.

As to the foreign plaintiffs and Americans who purchased abroad, the court found little reason to support subject matter jurisdiction, assuming that the bulk of the allegedly fraudulent activities of the defendants occurred abroad.[21] If the domestic acts of the defendants were merely "preparatory" to the ultimate deception effected by delivery of a misleading prospectus abroad, then those American activities would not be sufficient to support subject matter jurisdiction over claims of foreign purchasers who purchased abroad. The court summarized its holding:

> "We have thus concluded that the anti-fraud provisions of the federal securities laws:
>
> (1) Apply to losses from sales of securities to Americans resident in the United States whether or not acts (or culpable failures to act) of material importance occurred in this country; and
>
> (2) Apply to losses from sales of securities to Americans resident abroad if, but only if, acts (or culpable failures to act) of material importance in the United States have significantly contributed thereto; but
>
> (3) Do not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States directly caused such losses."

*Id.* at 993.

The third principle enumerated by Judge Friendly, *supra,* would apply at least to the purchases of KRCC eurodollar convertible debentures by IIT in the instant case. The *Bersch* court, however, was careful to distinguish situations in which foreigners suffered losses as the result of sales to them within the United States, *id.,* which is the situation presented by the purchases of King Resources common stock and the Colorado Corp. transactions alleged in this complaint.

Nonetheless, in another case decided the same day as *Bersch,* Judge Friendly, again writing for the Second Circuit, shed some light on the subject matter jurisdiction issue as it relates to a foreign plaintiff who purchases securities connected to the United States, ironically the same foreign plaintiff involved in this case. In *IIT v. Vencap,* 519 F.2d 1001 (2d Cir. 1975), IIT alleged that Richard Pistell, a foreign resident and

---

**21.** The district judge had upheld jurisdiction in part on the basis of the American activities involved in the foreign offerings. These included meetings of underwriters and lawyers in New York, retention of American lawyers and accountants by underwriters in New York, preparation of parts of the draft prospectus in New York, and the opening of various bank accounts in New York. *See* 519 F.2d at 985 n.

**24.** Nonetheless, because the underwritings were predominantly foreign, with final closings outside of the United States and delivery of the prospectus to purchasers outside of the United States, the Second Circuit held that the United States activities were "preparatory" and could not support subject matter jurisdiction, at least as to the foreign purchasers. *Id.* at 987.

a principal in the defendant Bahamian venture capital firm, had fraudulently induced IIT to become a preferred shareholder in Vencap and then misappropriated Vencap's assets for his own benefit. The record disclosed a series of complicated activities by Pistell, both here and abroad, which allegedly contributed to the fraud. Unlike this case, however, plaintiffs in *Vencap* did not explicitly allege complicity by IIT Management Co., but rather that Pistell had practiced his fraud directly on the principals of the management company. Accordingly, the facts centered around Pistell's actions in negotiating and then signing the investment agreement with IIT and the American contacts made during the transactions. *See id.* at 1004–10.[22]

In an important aspect of its holding for purposes of this case, the *Vencap* court considered again a plaintiff's argument that American "effects"—in that case the existence of some American fundholders in IIT—provided a basis for subject matter jurisdiction, even over Pistell's concededly foreign activities. The court held that the mere existence of a *de minimis* number of American fundholders would not create the "substantial" effect within the United States required under such an "effects" approach. *Id.* at 1017. As to the allegedly American conduct of Pistell, however, the court upheld at least the possibility of subject matter jurisdiction under the general theory that Congress did not intend "to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." *Id.* The court continued:

> "Our ruling on this basis of jurisdiction is limited to the perpetration of fraudulent acts themselves and does not extend to mere preparatory activities or the failure to prevent fraudulent acts where the bulk of the activity was performed in

foreign countries, such as in *Bersch.* Admittedly the distinction is a fine one. But the position we are taking here itself extends the application of the securities laws to transnational transactions beyond prior decisions and the line has to be drawn somewhere if the securities laws are not to apply in every instance where something has happened in the United States, however large the gap between the something and a consummated fraud and however negligible the effect in the United States or on its citizens."

*Id.* at 1018.

In an instructive analysis, the *Vencap* court proceeded to consider each of the possible theories of the plaintiffs' case under the standards outlined above. Under each of the various theories, of course, the domestic acts alleged took on differing positions on the continuum between "preparatory" and "consummate" fraudulent acts, with the court determining that under some theories, at least, Pistell's American activities might be sufficient to support subject matter jurisdiction over his fraud on IIT. *See id.* Even without *Vencap,* it would seem apparent that in the context of a suit by a foreign plaintiff, even a suit involving purchases of American securities in the United States, the jurisdictional significance of the defendants' allegedly domestic fraudulent acts must be considered in the context of the plaintiffs' theory of the case. To this topic we now turn.

### B. *Plaintiffs' Theory*

When *Vencap* was decided in 1975, the state of 10b–5 law was less settled than it is now, and Judge Friendly found it necessary to evaluate subject matter jurisdiction over that somewhat ambiguous complaint in the context of five separate theories he found potentially alleged.[23] This complaint, as

---

**22.** Two respected commentators have called the facts of *Vencap* "extraordinarily complicated and to a large extent obscure." R. Jennings & H. Marsh, *Securities Regulation* 1241 (1977). Subsequent to the IIT investment in Vencap, Pistell allegedly entered into a number of transactions, involving a German bank and a Neth-

erlands Antilles company, to siphon funds from Vencap in order to satisfy his federal tax liabilities.

**23.** *See* 519 F.2d at 1011–14. Judge Friendly's willingness to consider any conceivable plaintiff's theory must have been induced, at least in

amplified by the plaintiffs' memoranda and as viewed in light of substantive 10b–5 developments since *Vencap,* is not so complex.

As discussed above, this complaint alleges a conspiracy, or series of conspiracies, between IIT Management and several other groups of defendants to defraud IIT's fundholders. In challenging the various investments made on behalf of the fund, the complaint does not allege that IIT Management was deceived in any way as to the quality or value of the acquisitions. Rather, it alleges complete and primary complicity on the part of the principals of IIT Management in their efforts to loot the fund for their own profit.[24] Accordingly, the liquidators seek to represent the fund by bringing a derivative action, as a shareholder in a corporation could, on behalf of the fund against the fund's managers and those who allegedly aided and abetted them in their fraudulent scheme.

■ Although claims under other securities laws are contained in the complaint, the plaintiffs have essentially rested their theory on section 10(b) of the 1934 Act and Rule 10b–5.[25] We begin, then, with the propositions that a corporation defrauded in connection with its purchase or sale of a security has standing to sue under the Rule, *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), and that a shareholder may sue derivatively to assert the rights of such a defrauded corporation. *See, e. g., Dasho v. Susquehanna Corp.,* 461 F.2d 11 (7th Cir.), *cert. denied,* 408 U.S. 925, 92 S.Ct. 2496, 33 L.Ed.2d 336 (1972).

■ As the Second Circuit has noted, however, the problem with applying the rule in derivative actions in which the complicity of management is alleged "has lain in the degree to which the knowledge of officers and directors must be attributed to the corporation, thereby negating the element of deception." *Goldberg v. Meridor,* 567 F.2d 209, 215 (2d Cir. 1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978). "The resolution of this problem has come in the theory that if the board or a majority of directors has a conflict of interest in the challenged transaction, even though complete disclosure is made to them, they could be held to have defrauded the corporation." *Goldberger v. Baker,* 442 F.Supp. 659, 663 (S.D.N.Y.1977), citing *Goldberg v. Meridor,* 567 F.2d at 215. Because some earlier cases seemed to focus more on the fraud inherent in the transaction, there was some question whether this type of 10b–5 theory required an independent deception of the shareholders. *See Popkin v. Bishop,* 464 F.2d 714, 719 (2d Cir. 1972).[26] The Supreme Court has now made it clear, however, that improper manage-

---

part, by *Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), a case about which he exhibited mild skepticism, *see* 519 F.2d at 1014 n.26, and considered a roadsign pointing toward further "receding" of the limits on Rule 10b–5. *See id.* at 1013–14. In addition, the possibility existed that the Rule could be applied to corporate transactions that were inherently fraudulent or unfair but did not include an identifiable deception of shareholders, as his discussion of theories "2" and "3" indicates. *Id.* at 1012–13. As discussed in the text, *infra,* this theory of 10b–5 liability has been put to rest by *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), which makes the analysis of potential 10b–5 theories and subject matter jurisdiction in this case less complex. Further, for a survey of developments after *Vencap* that reveals why *Bankers Life & Casualty* must be considered a highwater mark and not a harbinger of things to come, *see* Katcher, *Securities Regulation,* 1976 Ann.Survey Am.L. 443, 449–53.

**24.** The complicity theory was apparently the primary one offered by the plaintiffs' shotgun approach in *Vencap. See* 519 F.2d at 1013 n. 22.

**25.** Plaintiffs have not seriously contended that they could state a claim under either the 1933 Act or the Investment Advisors Act, or that even if they could, such claims would support a broader subject matter jurisdiction than Rule 10b–5 and § 27 of the 1934 Act.

**26.** *Compare Ruckle v. Roto Am. Corp.,* 339 F.2d 24 (2d Cir. 1964) *with O'Neill v. Maytag,* 339 F.2d 764 (2d Cir. 1964). *See also Pappas v. Moss,* 393 F.2d 865, 869 (3d Cir. 1968). *See generally* R. Jennings & H. Marsh, *Securities Regulation* 998–99 (1977).

ment or breach of fiduciary duties by directors, without some identifiable deception of shareholders, does not come within the Rule. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

All of this happened in the wake of the Second Circuit's en banc holding on the merits in *Schoenbaum, supra,* a case in which the deception of American minority shareholders in the Canadian corporation was not emphasized. *See* 405 F.2d at 215, 218–19. Nonetheless, the Second Circuit was able to conclude after *Green* that *Schoenbaum* could rest on the ground that

"there is deception of the corporation (in effect, of its minority shareholders) when the corporation is influenced by its controlling shareholder to engage in a transaction adverse to the corporation's interests (in effect, the minority shareholders' interests) and there is nondisclosure or misleading disclosure as to the material facts of the transaction."

*Goldberg v. Meridor,* 567 F.2d at 217. As to the inadequate disclosure in *Meridor,* the plaintiff could allege a misleading press release at the time of the challenged transaction, so the court was not faced with the more difficult issue whether pure nondisclosure surrounding a transaction for which no shareholder approval was necessary could constitute an actionable deception under Rule 10b–5.[27]

Assuming that this 10b–5 theory can be applied to organizations similar to mutual funds, with the fundholders in the position of the minority shareholders discussed above, this is the theory embodied in IIT's complaint. Management (in this case, IIT Management Co.) is alleged to have had a conflict of interest in causing the corporation (the fund) to make damaging purchases of securities.[28] Under principles of aiding and abetting liability,[29] the other defendants are alleged to have known of the fraud and given it substantial assistance.

The final element of the 10b–5 claim is the plaintiffs' ability to show the materiality of the deficient disclosure by management. In the context of derivative actions challenging corporate transactions that require no shareholder approval, the issue of materiality has become somewhat troublesome, since it is difficult for minority shareholders to allege that they would have acted differently had proper disclosure been made. *See, e. g., Santa Fe Industries, Inc. v. Green,* 430 U.S. at 474 n.14, 97 S.Ct. 1292. To some extent, this circuit has relied on the theoretical ability of shareholders to enjoin the transaction under state law to supply the necessary materiality for a later 10b–5 claim. *Goldberg v. Meridor,* 567 F.2d at 219–20. *See also SEC v. Parklane Hosiery Co.,* 558 F.2d 1083, 1088 (2d Cir. 1977). Although there are substantial unanswered questions about this approach to the materiality requirement,[30] it is sufficient for the

---

**27.** Such a holding would effectively impose an independent duty on directors, in addition to the other reporting provisions of the Act, to make disclosures to minority shareholders about transactions in which the directors have a conflict of interest and no shareholder approval is otherwise required. *See Goldberg v. Meridor,* 567 F.2d at 221 n.10. It is interesting to note that such a holding was advocated by the SEC ten years ago as amicus curiae in the *Schoenbaum* rehearing en banc, but has never been explicitly adopted by the Second Circuit. *See Brief for the SEC as Amicus Curiae on Rehearing* at 36–43, *Schoenbaum v. Firstbrcok,* 405 F.2d 215 (2d Cir. 1968) (en banc), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). *Compare Goldberg v. Meridor, supra.*

**28.** The parties have not raised the point with respect to the Colorado Corp. "convertible

note," but it is worth mentioning that whether a promissory note is a security within the meaning of the securities laws can be a difficult question. *Compare Exchange Nat'l Bank v. Touche Ross & Co.,* 544 F.2d 1126 (2d Cir. 1976) *with Emisco Indus., Inc. v. Pro's, Inc.,* 543 F.2d 38 (7th Cir. 1976). A similar point was left unanswered in *Vencap,* 519 F.2d at 1014 n.25.

**29.** *See e. g., Rolf v. Blythe, Eastman Dillon & Co.,* 570 F.2d 38 (2d Cir. 1978) (elements of aiding and abetting), *cert. denied,* —— U.S. ——, 99 S.Ct. 642, 58 L.Ed.2d —— (1978); *Hirsch v. duPont,* 553 F.2d 750 (2d Cir. 1977).

**30.** *See, e. g., Goldberg v. Meridor,* 567 F.2d at 223 & nn.7 & 9 (Meskill, J., dissenting); *Goldberger v. Baker,* 442 F.Supp. at 665–66 n.6. For the same problem in a different context,

moment to say that in a domestic case, a plaintiff could probably traverse the pleading stage of his action by alleging that had adequate disclosure been made, he would have had a remedy under state law to prevent the improper transaction.

■ In any event, assuming that the required deception of the fundholders and the materiality of the deficient disclosure could be established by the plaintiffs, the instant complaint, at least in a totally domestic context, would make out a plausible derivative action under Rule 10b–5.[31]

### C. Subject Matter Jurisdiction and the Plaintiffs' Theory

■ When a derivative action like this one involves a foreign corporation (or investment trust) and the principles of a subject matter jurisdiction are applied to the plaintiffs' theory, however, the fatal problems with the case become readily apparent. Not only is the ultimate alleged deception obviously a nondomestic act, but the Court is asked to impose a 10b–5 duty to disclose on foreign directors of a foreign corporate entity for the benefit of foreign fundholders. Such an expansion of Rule 10b–5, even if possible under international law and the Constitution, cannot be warranted.

Of the subject matter jurisdiction cases discussed above, Schoenbaum is clearly

most comparable to the instant one. The "effects" test created in that case was satisfied because the Canadian corporation had a minority of American shareholders and was listed on the American Stock Exchange. Accordingly, the court held that application of the Rule to the Canadian transaction was justified to protect American investors who had purchased shares on an American exchange. See Schoenbaum, 405 F.2d at 206. Those American contacts, or "effects," are simply not present in this case.[32]

Moreover, even employing a more generalized "effects" test, plaintiffs can point to no American effects of the challenged transactions capable of supporting subject matter jurisdiction. As the court held in Bersch, an unparticularized deleterious effect on the American economy resulting from the IOS collapse—i. e. a damaged ability to attract offshore investment funds—is not sufficient. Bersch, 519 F.2d at 998–99. Further, Vencap held specifically that subject matter jurisdiction over a predominantly foreign fraud on a foreign investment trust cannot be sustained "simply because half of one per cent of its assets [were] held by Americans." Vencap, 519 F.2d at 1017.[33] Under the "effects" test of Schoenbaum, then, as developed in Bersch and Vencap, subject matter jurisdiction is unsupported in this case.

see Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 450 F.Supp. 639, 644 (S.D.N.Y. 1978).

**31.** Another conceivable theory for plaintiffs in this case, similar to Judge Friendly's theory "5" in the Vencap case, see 519 F.2d at 1013–14, would be that the plaintiffs are suing derivatively as a shareholder in King Resources Co., for damages done by the defendants to that corporation. At first blush, even this theory would seem to present the same "deception" problem, for the question would be the extent to which King's disclosure to IIT Management Co., as agent for the shareholder IIT, could be attributed to the fund. In any event, the plaintiffs have never even hinted at this theory, and have not alleged any purchases or sales of securities by King Resources Co. which damaged the company during the period IIT was a shareholder. At this late stage, in a case over three years old, there is no justification for pursuing such speculation.

**32.** Those domestic investors in King Resources Co. who were allegedly deceived and injured by misleading disclosures surrounding that company of course, could bring individual or class actions on their own behalf against the King group and any alleged aiders and abettors. Indeed, they have done so. Dietrich Corp. v. King Resources Co., C–3424 (D.Col., filed Sept. 28, 1971). The instant plaintiffs apparently "opted out" of the class covered by the Dietrich litigation before a settlement was reached in that action, and they have since discontinued this action as against the King Resources defendants. See note 1 supra.

**33.** The figure used in this case for the number of IIT fundholders residing in the United States, see note 5 supra, is apparently a current one. No one has argued that Judge Friendly's figure for the previous time period was incorrect.

■ Neither can subject matter jurisdiction be sustained because the alleged scheme as a whole involved the purchase of American securities and some domestic acts by alleged American aiders and abettors.[34] The substantive developments in the law since *Schoenbaum* have made it clear that the ultimate deception required to be proved in this type of derivative action is a deception of the fundholders themselves. This is the decisive element of the plaintiffs' claim and, without it, there is no viable claim against the primary alleged wrongdoer, IIT Management Co. Without primary liability, there can be no aiding and abetting liability for the concededly American, but collateral, participants. So long as the derivative action is one alleging total complicity on the part of foreign management, the ultimate focus of the theory remains a deception of foreign fundholders by foreign "directors." In the language of *Bersch* and *Vencap,* all the domestic acts of the alleged aiders and abettors become "preparatory" or secondary to the primary deception practiced on the fundholders. Since virtually all the fundholders were foreign nationals residing in foreign countries, the deception, if it could be proved, *must* have occurred outside of the United States.

The materiality element presents a further roadblock. Under the materiality concept discussed above, even if the plaintiffs could show a deception of the fundholders, they would be faced with an insurmountable problem in showing the effect of deficient disclosure under foreign law. Indeed, following the approach of *Goldberg v. Meridor, supra,* the plaintiffs have argued that had adequate disclosure surrounding these securities purchases been made, they would have been able to enjoin the challenged transactions under Luxembourg law. This places the plaintiffs in a curious position in that by establishing their right to an injunction under Luxembourg law, they could prove 10b-5 materiality; simultaneously, however, they would be offering a good reason not to apply Rule 10b–5 to the transactions, since the availability of relief under foreign law would then be at least partially evident. *Cf. Schoenbaum v. Firstbrook,* 405 F.2d at 209 n.5 (noting relevance of foreign cause of action to *forum non conveniens* considerations). Presumably, relegating these plaintiffs to Luxembourg law, as applied by a court of general jurisdiction where personal jurisdiction could be obtained over the defendants, would then not be an empty gesture.[35]

For these reasons, therefore, application of Rule 10b–5 to these transactions under plaintiffs' theory is not supportable. Under their own theory, the primary fraud, even though aided by Americans and effected by purchases of securities made in the United States, occurred outside of this country. Following *Vencap's* formulation, the essential fraud here was foreign, "and the line has to be drawn somewhere if the securities laws are not to apply in every instance where something has happened in the United States, however large the gap between that something and a consummated fraud and however negligible the effect in the United States or on its citizens." 519 F.2d at 1018.

This holding is also aided by a view from a less technical perspective. *Vencap* enunciated the sensible idea that

"Congress [did not intend] to allow the United States to be used as a base for manufacturing fraudulent security de-

---

34. Moreover, if the challenged transactions were viewed separately, the claim relating to the purchases of eurodollar debentures, in a foreign offering aftermarket, should clearly be dismissed under the specific authority of *Bersch.* Like the domestic activities catalogued in *Bersch, see* note 21 *supra,* the domestic activities alleged in this case with respect to the foreign offering amounted to little more than preparatory acts. *See, e. g., F.O.F. Proprietary Funds, Ltd. v. Arthur Young & Co.,* 400 F.Supp. 1219 (S.D.N.Y.1975). Because of the plaintiffs' conspiratorial derivative theory, however, it is not necessary to consider the issue of subject matter jurisdiction separately as to each of the transactions.

35. A suit in an American state court, for instance, could result in an adjudication on the merits, presumably after a conflict of laws determination as to what law could be applied to the allegedly fraudulent acts of these defendants.

vices for export, even when [those] are peddled only to foreigners."

*Id.* at 1017. With this proposition, no one could quarrel. If the principals of IIT Management Co., as good faith fiduciaries, had come to the United States and been fraudulently induced to purchase American securities by the schemes of John King, with King aided and abetted by other Americans, then there would seem to be good reason to permit IIT to return and sue for the damages it suffered and to apply Rule 10b–5 to the transactions. *See, e. g., Straub v. Vaisman & Co.,* 540 F.2d 591 (3d Cir. 1976); *Wandschneider v. Industrial Incomes, Inc.,* [1971–72] Fed.Sec.L.Rep. (CCH) ¶ 93,422 (S.D.N.Y.1972).

When the scheme finds its genesis abroad, however, with a group of foreign managers of a foreign investment trust violating what would appear to be their fiduciary duties to their fundholders, and the foreign managers merely enlist the aid of American aiders and abettors, then the prospect of applying federal law to the transactions is drastically changed. Essentially, like any derivative action alleging total complicity on the part of directors, such a case involves primarily the relationship between directors and shareholders. In this case, it involves the obligations of a trust management corporation to the trust under Luxembourg law.

In the domestic derivative action, the result of applying Rule 10b–5 is that federal law begins to usurp traditional state law functions in enforcing the fiduciary duties by which directors are held accountable to their shareholders, and the debate goes on about the propriety of such expanded interpretations of the federal securities law.[36] Indeed, like the usual domestic derivative securities case, the instant complaint explicitly alleges pendent state and common law claims for corporate waste, mismanagement, breach of fiduciary duties and breach

of contract by the IIT Management defendants. These allegations only emphasize the inherent focus of the complaint on issues of local law and the internal management of the trust. Even in the domestic context, state law has traditionally been viewed as the primary source for rules of conduct involving corporate management. *See Cort v. Ash,* 422 U.S. 66, 84–85, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and the growing application of the federal securities laws to internal corporate relationships has, for the most part, been justified by the overall federal regulatory scheme for registered, publicly traded domestic corporations. *See, e. g., Goldberg v. Meridor,* 567 F.2d at 221; Bloomenthal, *From Birnbaum to Schoenbaum: The Exchange Act and Self-Aggrandizement,* 15 N.Y.L.F. 332 (1969).

Whatever the value or justification for "federalizing" the law of corporate management in the domestic context, an extension of the law to "Americanize" the corporation laws of the entire world is a different prospect. In *Schoenbaum,* at least, application of Rule 10b–5 to the directors and controlling shareholder in a foreign corporation was supported somewhat by the presence of American minority shareholders and the listing of the corporation's shares on the American Stock Exchange. Upholding subject matter jurisdiction in this case, however, would be a large leap from *Schoenbaum.* It would mean that a foreign shareholder in any foreign corporation that bought American securities could bring a derivative action in this country to challenge the conduct of the foreign directors who effected the purchases. It would also mean that duties imposed under Rule 10b–5 would control the management activities of foreign directors anytime their corporations decided to invest in American securities. In this case, with no significant American fundholders and no other fundholder contacts with the United States, application of

---

**36.** *See, e. g., Santa Fe Indus., Inc. v. Green,* 430 U.S. at 478–79, 97 S.Ct. 1292; *Piper v. Chris-Craft Indus., Inc.,* 430 U.S. 1, 40, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); *Cort v. Ash,* 422 U.S. 66, 84, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1974); *Superintendent of Ins. v. Freedman,* 443

F.Supp. 628, 639 (S.D.N.Y.1977). *See generally* Cary, *Federalism and Corporation Law, Reflections Upon Delaware,* 88 Yale L.J. 663 (1974); Note, *The Controlling Influence Standard in Rule 10b–5 Corporate Management Cases,* 86 Harv.L.Rev. 1007 (1973).

the Rule to the alleged mismanagement of IIT would be a totally unprecedented and unauthorized expansion of the reach of Rule 10b–5.[37]

This is not to say that the American authorities are powerless to enforce the securities laws against persons who, acting in this country, aid and abet a foreigner's fraud scheme directed at a foreign corporation. The jurisdictional considerations, and presumably the statutory authority and the congressional intent involved in a SEC enforcement action or a criminal action would be substantially different from those in this case. *See e. g., SEC v. Kasser,* 548 F.2d 109, 116 (3d Cir.), *cert. denied,* 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *United States v. Cook,* 573 F.2d 281 (5th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978). Moreover, the substantive elements in an enforcement action may be different from a private derivative damage action, thereby changing the factors involved in the analysis of subject matter jurisdiction.[38] Also, the prudential and policy considerations relating to an SEC injunctive action involving transnational transactions might be significantly different.

When the case is a private derivative one for damages which hinges on the obligations of management to fundholders in a foreign investment trust, however, the subject matter jurisdiction issue revolves around a core substantive claim of deception that is inherently foreign. The investors who purchased units in IIT committed their funds to a Luxembourg trust managed by a Luxembourg corporation. In one instance, the IIT prospectus stated explicitly that the IIT regulations governing the fund's management were "approved by the Luxembourg Government." [39] These foreign investors could not reasonably expect American federal law to control the obligations of the management company to the fund merely because some of the fund's assets were American securities. Moreover, the essential claims are for waste of corporate assets and a conspiracy to defraud the fundholders—claims that are undoubtedly cognizable under Luxembourg law.[40]

Rule 10b–5 is a valuable provision to police domestic securities markets and even domestic corporate directors whose corporations deal in securities. That does not mean that we should attempt to enforce it in boardrooms all over the world, even if one international securities fraud involving offshore funds has received much notoriety.[41] At least in the absence of a more specific congressional directive authorizing such an application of Rule 10b–5, this Court cannot uphold subject matter jurisdiction in the context of this case.

### IV.

For these reasons, therefore, the Court has determined that subject matter jurisdiction over the plaintiffs' claims based on the federal securities laws cannot be sustained. The various claims alleged under pendent jurisdiction will accordingly be dismissed. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

---

**37.** *See* Harvard Note, *supra* note 19, at 566–67.

**38.** *See, e. g., SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (actual injury not required in SEC injunction action under Investment Advisors Act); *SEC v. Coven,* 581 F.2d 1021 (2d Cir. 1978) (negligence sufficient in injunction action under § 17 of the 1933 Act). In addition, of course, the SEC's ability to supervise registered broker-dealers stands on a substantially different statutory footing than that involved in a private action for damages under Rule 10b–5.

**39.** IIT Prospectus, dated March 31, 1970 (plaintiffs' exhibit 5).

**40.** Indeed, it is not unrealistic to expect other nations to regulate the internal obligations of investment trusts and corporations created under their laws. *See* Harvard Note, *supra* note 19, at 566 & n.22 (citing British and French examples); *see also* Penn. Note, *supra* note 19, at 1393–97 (arguing for consideration of parties' expectations and choice of law principles in determining question of subject matter jurisdiction).

**41.** *See* Bialkin, *Offshore Investment Funds,* 1972 J.Bus.Law 72, 77 (discussing the *Institutional Investor Study Report of the Securities and Exchange Commission* (1971), and the potential for local foreign regulation of non-American institutional investors).

The defendants' motions to dismiss on these grounds are granted, and there is no need to consider the statute of limitations or any other of the various grounds raised by defendants in their motions. *See* note 1 *supra.*

The parties will settle an order.