CONTINENTAL GRAIN (AUSTRALIA) PTY. LTD., Appellant,

v.

PACIFIC OILSEEDS, INC. and Carl Ernest Claassen, Appellees,

and

Northrup, King & Co.

No. 78–1418.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 19, 1978.

Decided Feb. 6, 1979.

Rehearing and Rehearing En Banc Denied Feb. 28, 1979.

---

Michael A. Berens, Oppenheimer, Wolff, Foster, Shepard & Donnelly, Minneapolis, Minn. (argued), David Strain and Robert K. Schiebelhut, Lillick, McHose & Charles, San Francisco, Cal., on brief, for appellant.

Lawrence C. Brown, Faegre & Benson, Minneapolis, Minn. (argued), John D. Shively, Minneapolis, Minn., John P. Macmeeken, Chickering & Gregory, San Francisco, Cal., on brief, for appellees.

Before LAY, ROSS and McMILLIAN, Circuit Judges.

McMILLIAN, Circuit Judge.

Continental Grain (Australia) Pty. Ltd. (hereinafter referred to as Continental) appeals from an order entered by the District Court for the District of Minnesota granting the motion of defendants Pacific Oilseeds, Inc. (hereinafter POI) and Carl Ernest Claassen (hereinafter Claassen) to dismiss Continental's complaint alleging violation of federal securities laws, common law fraud and breach of contract. Because parties on both sides of the motion referred the district court to affidavits, depositions and other matters outside the pleadings, the district court treated the motion as one for summary judgment, pursuant to Fed. Rules of Civil Proc. Rule 12(c). The question presented is squarely jurisdictional: did the district court err in dismissing the complaint for lack of subject matter jurisdiction?

For the reasons discussed below, we conclude the district court did have subject matter jurisdiction and therefore reverse and remand the case for further action not inconsistent with this opinion.

The facts are not in dispute; the parties do, however, disagree sharply over the jurisdictional significance of those facts. In any case, we accept as true the allegations of the complaint for the purpose of appeal. *E. g., Fargo Partners v. Dain Corp.*, 540 F.2d 912, 914 (8th Cir. 1976).

Continental purchased all of the stock of Pacific Seeds (Australia) Pty. Ltd. (hereinafter PacSeeds), an Australian corporation, from three vendors. The three vendors were Australian Chemical Holdings, Ltd. (hereinafter Australian Chemical), an Australian corporation and owner of 51% of the stock of PacSeeds; defendant POI, a California corporation and owner of 48% of the stock of PacSeeds; and defendant Claassen, a California resident, president of POI and owner of 1% of the stock of PacSeeds. Continental is an Australian corporation, a wholly-owned subsidiary of Continental Grain Corp., a Delaware corporation. Any financial loss suffered by Continental (Australia) would be reflected in the accounts of the parent Continental Grain Corp. because, under Continental Grain Corp.'s accounting principles, the financial transactions of the two corporations are consolidated.

At the time of the stock purchase in August, 1974, PacSeeds was a party to a ten-year license agreement with Northrup, King & Co. (hereinafter Northrup, King), a Minnesota corporation, under which Northrup, King supplied PacSeeds with hybrid sorghum parental materials or seedstock. Apparently this license agreement, or at least the continued availability of hybrid seedstock, constituted the primary asset of PacSeeds.

Sometime before May 7, 1974, Continental investigated PacSeeds as a possible acquisition and obtained a copy of the Northrup, King-PacSeeds license agreement. On May 7, Continental submitted a written proposal to purchase PacSeeds to Peter Leech, a resident of Australia and managing director of Australian Chemical, who acted as an agent for the three vendors in negotiating the sale. Neither Claassen nor any other representative of POI had any *direct* contact with Continental. Part of the proposal to purchase specified the termination of the license agreement and the vendors' guarantee that PacSeeds would enjoy continued use of the hybrid seedstock. Leech forwarded the proposal by mail to Claassen in California with the observation that in his (Leech's) opinion PacSeeds would be able to continue to use the hybrid seedstock already in its possession without restriction after the termination of the license agreement.

Claassen, however, was already aware that Northrup, King did not share this opinion and intended to reclaim any hybrid seedstock in the possession of PacSeeds upon termination of the license agreement. On May 14, 1974, Claassen called Allenby White of Northrup, King to tell him there was a prospective buyer of PacSeeds and added that "it would be wrong" for Northrup, King to "spoil the deal" with Continental by telling Continental of Northrup, King's intention to reclaim the seedstock upon termination of the license agreement.

On May 15 or 16, Claassen, Leech and Michael Cole, corporate counsel for PVO International, Inc., discussed the Continental proposal in a transpacific telephone call. PVO International, Inc., a California corporation, is the parent corporation of POI. At this time Claassen, Leech, Cole and other corporate representatives of POI knew that Northrup, King intended to reclaim the hybrid seedstock then in the possession of PacSeeds upon termination of the license agreement. On May 17, Cole wrote to Leech, referring to Northrup, King's intention to reclaim the seedstock, and indicated PacSeeds was unwilling to make any representations or warranties about the license agreement or the continued use of the seedstock.

In early June, Continental sought legal advice from an Australian and a New York law firm; both firms were of the opinion that the seedstock would be availa-

ble to PacSeeds after the termination of the license agreement.[1]

On June 14, 1974, Claassen again wrote to Leech, emphasizing that any difficulties with the license agreement should be considered Continental's and not PacSeeds'. On June 17, 1974, Allenby White sent Claassen a formal termination letter, notifying him that the license agreement was nontransferable and that Northrup, King did not intend to renew the license agreement after its expiration on October 27, 1974. This letter also stated that PacSeeds could not use the seedstock then in its possession to produce commercial seeds or give away, sell or dispose of this seedstock in any way. On June 20, 1974, Claassen wrote Leech again, confirming that Northrup, King intended to reclaim the seedstock and directing Leech not to "spoil the deal" by informing Continental of this development.[2]

At no time during the negotiations did any representative of POI, PacSeeds or Northrup, King directly communicate with Continental with regard to Northrup, King's intention to reclaim the hybrid seedstock. To the extent it is possible to ascribe an origin to the failure to disclose, the district court found it had been conceived in and directed from the United States. This "scheme of nondisclosure" about the status of the license agreement is the heart of Continental's allegation of securities fraud.

The contract for the sale of PacSeeds to Continental was executed by POI and Claassen in California. James Dawe, the corporate secretary of POI, then personally delivered the sales contract in Australia and attended the closing in Sydney, Australia on August 9, 1974. The closing was intentionally held outside the United States for

1. This legal advice would appear to raise a question about causation in fact; that is, whether the alleged fraudulent nondisclosure caused Continental to purchase the securities. Causation in fact is an essential element of a private cause of action under § 10(b) and Rule 10b–5. *E. g., Shapiro v. Merrill, Lynch, Pierce, Fenner & Smith*, 495 F.2d 228, 238 (2d Cir. 1974). In cases of nondisclosure, however, this Circuit has adopted a rebuttable presumption in favor of reliance where materiality has been established. *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 717 (8th Cir. 1978); *St. Louis Union Trust Co. v. Merrill, Lynch, Pierce, Fenner & Smith*, 562 F.2d 1040, 1048–49 (8th Cir. 1977), *cert. denied*, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978); Note, *The Reliance Requirement in Private Actions Under SEC Rule 10b–5*, 88 Harv.L.Rev. 584, 590–91 (1975). *Cf. Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (obligation to disclose and withholding of material fact establish causation in fact); *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 238–39 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975) (materiality); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380–81 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975) (plaintiff need not show reliance but must show materiality to establish causation in case of nondisclosure).

For the purposes of analysis on the question of subject matter jurisdiction, we assume Continental would be able to successfully show materiality or, conversely, that POI and Claassen would not be able to establish "non-reliance." *See Rochez Bros. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974), *cert. denied*, 425

U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976). "If it should be disclosed that the allegedly fraudulent conduct of any of the defendants within this country was nonexistent or was so minimal as to be immaterial, then the district court, or this Court on appeal, may be warranted in dismissing the action for want of jurisdiction." *SEC v. Kasser*, 548 F.2d 109, 116 (3d Cir.), *cert. denied sub nom. Churchill Forest Industries (Manitoba), Ltd. v. SEC*, 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *see Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1330 (2d Cir. 1972).

2. Continental argues that the letter of June 20, 1974, also revealed that Northrup, King was part of the "conspiracy of silence." We note that Northrup, King has filed a counterclaim in a related case for an accounting, return of the hybrid seedstock, and punitive damages in *Pacific Oilseeds (Australia) Pty. Ltd. v. Northrup, King & Co.*, No. 4–74–Civ. 602 (D.Minn., dismissed with prejudice, July 26, 1978). The district court's order in the present case transferred sua sponte Continental's claims against Northrup, King to the District Court for the Northern District of California where Continental filed a similar action on June 29, 1977. *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.*, No. C–77–1666 CFP (N.D. Cal.). Continental characterizes the California action as protective in nature, *cf. O'Hare International Bank v. Lambert*, 459 F.2d 328, 331 (10th Cir. 1972) (considerations of comity), and stresses that the District of Minnesota is its preferred forum. The district court transfer has been stayed pending appeal.

tax reasons. The PacSeeds stock certificates were delivered at the closing, at which time Continental made the initial payment of the purchase price in Australian dollars. Dawe converted the payment to U.S. dollars and wired it to California. The balance of the purchase price was paid in November, 1974, after a post-closing audit and was also wired to California.

The license agreement expired in October, 1974, and was not renewed. Northrup, King subsequently asserted in a related proceeding that it is entitled to possession of the hybrid seedstock. *See* note 2 *supra.*

Continental in Count I[3] of its complaint alleged POI and Claassen violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Count II alleged that certain warranty language in the sales contract executed August 9, 1974, constituted material misrepresentations in violation of § 10b and Rule 10b-5. Counts III and IV alleged common law fraud and breach of contract.

The district court dismissed the action for lack of subject matter jurisdiction and personal jurisdiction as against POI and Claassen. This appeal followed.

*Subject Matter Jurisdiction*

Simply stated, the issue presented is whether the district court erred in dismissing Continental's complaint for lack of subject matter jurisdiction. The district court specifically found that POI and Claassen had engaged in no actionable conduct within the United States sufficient to enable the district court to exercise jurisdiction under § 10(b) and that the alleged effect (the decreased value of PacSeeds stock as reflected in the financial records of Continental's parent corporation, Continental Grain Corp.) was too remote to confer jurisdiction under § 10(b). For reversal Continental argues that defendants' conduct, the effect of that conduct in the United States and the nationality of defendants, whether considered separately or taken together, support a finding of subject matter jurisdiction.

The scope of federal jurisdiction under the federal securities laws as applied to international or transnational transactions has been the subject of much recent litigation, *see* cases cited in *United States v. Cook*, 573 F.2d 281, 283 (5th Cir. 1978), and discussion in law review articles.[4] In particular, Judge Friendly of the Second Circuit, "the Mother Court" of securities law, *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 762, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (Blackmun, J., dissenting), has written three comprehensive and scholarly opinions on this subject. *See IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir. 1975); *Bersch v. Drexel Firestone, Inc.*, 519

3. Count I also alleged defendants violated § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q. This court held subsequently that § 17(a) does not confer a private cause of action for damages on a purchaser of a security. *Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152 (8th Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). Continental did not pursue its claim for relief on this basis in the district court and does not do so now on appeal. The district court dismissed any claim based upon an alleged violation of § 17a in light of the *Shull* case.

4. *See generally* Mizrack, *Recent Developments in Extraterritorial Application of § 10(b) of the Securities Exchange Act of 1934*, 30 Bus.Law. 367 (1975); Note, *Extraterritorial Application of the Securities Exchange Act of 1934*, 69 Colum.L.Rev. 94 (1969); Note, *The Extraterritorial Application of the Antifraud Provisions of the Securities Acts*, 11 Cornell Int'l L.J. 137 (1978) [hereinafter cited as *Extraterritorial Application*]; Comment, *Jurisdiction in Transnational Securities Fraud Cases—SEC v. Kasser*, 7 Den.J. Int'l L. & Pol'y 279 (1978); Note, *American Adjudication of Transnational Securities Fraud*, 89 Harv.L.Rev. 553 (1976); Note, *Extraterritorial Application of United States Securities Laws*, 42 Mo.L.Rev. 158 (1977); Note, *Securities Laws—Subject Matter Jurisdiction in Transnational Securities Fraud*, 9 N.Y.U.J. Int'l L. & Pol'y 113 (1976); Note, *Extraterritorial Application of Section 10(b) and Rule 10b-5*, 34 Ohio St.L.J. 342 (1973); Comment, *The Transnational Reach of Rule 10b-5*, 121 U.Pa.L.Rev. 1363 (1973) [hereinafter cited as *Transnational Reach*]; Note, *Extraterritorial Application of § 10(b) of the Securities Exchange Act of 1934—The Implications of Bersch v. Drexel Firestone, Inc. and IIT v. Bencap, Ltd.*, 33 Wash. & Lee L.Rev. 397 (1977).

F.2d 974 (2d Cir.), *cert. denied sub nom. Bersch v. Arthur Andersen & Co.,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir. 1972); *see also SEC v. Kasser,* 548 F.2d 109 (3d Cir.), *cert. denied sub nom. Churchill Forest Industries (Manitoba), Ltd. v. SEC,* 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977) (Adams, J.); *Straub v. Vaisman & Co.,* 540 F.2d 591 (3d Cir. 1976) (Weis, J.); *Schoenbaum v. Firstbrook,* 405 F.2d 200 (2d Cir.), *rev'd on other grounds,* 405 F.2d 215 (2d Cir. 1968) (en banc), *cert. denied sub nom. Manley v. Schoenbaum,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). Judge Heaney of this Circuit addressed this question in *Travis v. Anthes Imperial Ltd.,* 473 F.2d 515 (8th Cir. 1973), persuasively finding in favor of extraterritorial application of the federal securities laws. *Id.* at 524.

We have several preliminary observations. First, although Continental in its complaint raises several possible bases for federal subject matter jurisdiction,[5] both sides in their briefs stress subject matter jurisdiction under § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. This emphasis is correct. *See IIT v. Vencap, Ltd., supra,* 519 F.2d at 1015; *Leasco Data Processing Equipment Corp. v. Maxwell, supra,* 468 F.2d at 1333. Section 27 of

the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, gives the district courts jurisdiction over all actions brought to "enforce any liability or duty created by this title or the rules and regulations thereunder." Under § 10(b), 15 U.S.C. § 78j(b), it is "unlawful for any person . . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . ." Rule 10b–5, 17 C.F.R. § 240.10b–5, makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ."

■ Second, the presence or absence of any single factor which was considered significant in other cases dealing with the question of federal jurisdiction in transnational securities cases is not necessarily dispositive. *See Travis v. Anthes Imperial Ltd., supra,* 473 F.2d at 523–24 n.14. A finding of jurisdiction will depend upon the analysis of the particular facts in any given case.[6]

---

5. Continental invoked the jurisdiction of the district court upon the basis of § 22 of the Securities Act of 1933, 15 U.S.C. § 77v; § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa; the Federal Declaratory Judgment Act, 28 U.S.C. § 2201; diversity jurisdiction, 28 U.S.C. § 1332 (this may explain in part why Australian Chemical was not made a party defendant and as such have defeated diversity jurisdiction, *see Ed & Fred, Inc. v. Puritan Marine Insurance Underwriters Corp.,* 506 F.2d 757, 758 (5th Cir. 1975)); and pendent jurisdiction.

6. After submission of the case on appeal, counsel for appellees directed the court's attention to a recent decision relating to the question of subject matter jurisdiction, *IIT v. Cornfeld,* 462 F.Supp. 209 (S.D.N.Y.1978). We have carefully reviewed Judge Goettel's excellent opinion and do believe the analysis presented in *IIT v. Cornfeld* is consistent with that presented herein. In *IIT v. Cornfeld* a principle implicit in the *ITT v. Vencap, Ltd.* case is expressly stated and applied: "in the context of a suit by a foreign

plaintiff . . . the jurisdictional significance of the defendants' allegedly fraudulent acts must be considered in the context of the plaintiffs' theory of the case." *IIT v. Cornfeld, supra* at 220; *see IIT v. Vencap, Ltd., supra,* 519 F.2d at 1018. The court compared the action in *IIT v. Cornfeld* to a shareholder derivative action. The liquidators of an international investment fund (IIT) on behalf of the fund alleged a conspiracy or series of conspiracies between the fund's management corporation and several other groups of defendants to defraud the fundholders. The complaint did not allege that the management corporation was deceived as to the quality or value of any of the fund's acquisitions but instead alleged "complete and primary complicity on the part of the principals of [the management corporation] in their efforts to loot the fund for their own profit." *Id.* The court observed that developments in the substantive law have made it clear that "the ultimate deception required to be proved in this type of derivative action is a deception of the fundholders themselves," *id.* at

Third, as in *Kasser*,[7] the present case involves a securities transaction that spans two continents in which the sole victim is a foreign corporation and the securities in question were not traded on any American exchange, had no measurable effect on domestic markets, and had only a minimal effect, if any, in the United States.

As discussed further below, we are persuaded that, in the present case, the conduct alleged to establish a violation of § 10(b), that is, the scheme of fraudulent nondisclosure devised in the United States by use of the mail and other instrumentalities of interstate commerce, is conduct significant enough to establish subject matter jurisdiction. *SEC v. Kasser, supra,* 548 F.2d at 111–12; *Travis v. Anthes Imperial Ltd., supra,* 473 F.2d at 524; *Leasco Data Processing Equipment Corp. v. Maxwell, supra,* 468 F.2d at 1335; *but see Bersch v. Drexel Firestone, Inc., supra,* 519 F.2d at 987. "The federal securities laws, in our view, do grant jurisdiction in transnational securities cases where at least some activity designed to further a fraudulent scheme occurs within this country." *SEC v. Kasser, supra,* 548 F.2d at 114. Analytically, of course, the questions are addressed in reverse: first, whether there is subject matter jurisdiction in such a case; second, whether there is sufficient use of the mail or interstate commerce to satisfy the jurisdictional requirements of § 10(b). *See Schoenbaum v. Firstbrook, supra,* 405 F.2d at 210. In our view, however, the questions are substantially the same, at least in transnational securities cases which, like *Travis, Kasser* and the present case, invoke conduct within the United States, typically involving use of the mail and telephones, as the jurisdictional basis.

We believe that this holding is consistent with applicable principles of international law, *see Restatement (2d) of the Foreign Relations Law of the United States* § 17 (1965) (Jurisdiction to Prescribe With Respect to Conduct, Thing, Status, or other Interest within Territory) [hereinafter cited as *Restatement 2d*],[8] and emphasize, as the

224; *see Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Because the ultimate focus of plaintiffs' theory of the case was derivative and thus based upon a deception of foreign fundholders by foreign directors (the management corporation, aided and abetted by American defendants), the domestic acts of the alleged aiders and abettors which supported plaintiffs' subject matter jurisdiction became, in the court's analysis, "preparatory or secondary to the primary deception practiced on the fundholders." *Id.* The primary fraud necessarily occurred outside the United States because nearly all the fundholders were foreign nationals residing in foreign countries. Thus, the domestic conduct was "merely preparatory" to the primary fraud practiced on the fundholders by the directors of the management corporation. In addition, the court stressed that the complaint, "like any derivative action alleging total complicity on the part of directors, . . . involve[d] primarily the relationship between directors and shareholders," which was largely a matter of internal management and local (Luxembourg) corporate law which the court was reluctant to "Americanize." *Id.* at 225.

In comparison, Continental has not brought the present action as a derivative action. The alleged scheme of nondisclosure which constitutes the fraud in the present case was devised and completed in the United States. Only the ultimate effect occurred in Australia.

7. *Kasser* involved actions for injunctive relief brought by the SEC; however, "[i]f there would be subject matter jurisdiction over a suit by the SEC to prevent the concoction of securities frauds in the United States for export, there would also seem to be jurisdiction over a suit for damages or rescission by a defrauded foreign individual." *IIT v. Vencap, Ltd., supra,* 519 F.2d at 1017–18 (footnote omitted) (expression of reservation as to class actions in footnote; present case involves suit for damages by defrauded foreign corporation).

See also Note, *Extraterritorial Application, supra* note 4, 11 Cornell Int'l L.J. at 152–53 (cases alleging fraud involving domestic conduct but little or no domestic effect should not be litigated in United States courts unless foreign prosecution is unlikely as in *Kasser*).

8. Section 17 provides:
A state has jurisdiction to prescribe a rule of law
(a) attaching legal consequences to conduct that occurs within its territory, whether or not such consequences are determined by the effects of the conduct outside the territory, and
(b) relating to a thing located, or a status or other interest localized, in its territory.
The Second Circuit has interpreted § 17 to require only conduct within the territory. *See Leasco Data Processing Equipment Corp. v. Maxwell, supra,* 468 F.2d at 1334.

cases cited above recognize, that our decision in favor of finding subject matter jurisdiction is largely based upon policy considerations.

In the absence of any guidance from legislative history, *see SEC v. Kasser, supra,* 548 F.2d at 114 n.21, the courts have looked to general principles of international law, the language of the securities statutes,[9] and the remedial purpose of these statutes.[10] Of the several generally recognized jurisdictional bases of international law,

> the courts have employed only the territorial principle in transnational securities cases. The opinions have discussed two variations of this principle. The first, the subjective territorial principle [hereinafter referred to as the conduct test], bases jurisdiction on conduct within the territorial limits of the state. The situs of the effects flowing from that activity is irrelevant to the inquiry. On the other hand, the second variation, the objective territorial principle [hereinafter referred to as the effects test], grants jurisdiction over acts which cause foreseeable and substantial effects within the territory regardless of where those acts occurred.

Note, *Extraterritorial Application, supra* note 4, 11 Cornell Int'l L.J. at 139 & nn.12–16 (footnotes omitted from quoted materi-

al); *see also* Sahovic & Bishop, *The Authority of the State: Its Range with Respect to Persons and Places,* in *Manual of Public International Law* 311 (M. Sorensen ed. 1968) (discussion of territorial principle as well as nationality, protective, universality, and passive personality principles). *But compare IIT v. Vencap, Ltd., supra,* 519 F.2d at 1016 (rejecting nationality alone as basis of jurisdiction), *and FOF Proprietary Funds, Ltd. v. Arthur Young & Co.,* 400 F.Supp. 1219, 1223 (S.D.N.Y.1975), *with Restatement 2d, supra,* § 30(1)(a), *and* Comment, *Transnational Reach, supra* note 4, 121 U.Pa.L.Rev. at 1387–89 (suggesting that the nationality of defendants may provide an independent jurisdictional basis, although the nationality of plaintiffs is merely another factor for consideration).

The courts have not applied the two tests uniformly. *See Recaman v. Barish,* 408 F.Supp. 1189, 1196 n.5 (E.D.Pa.1975). For example, in *Selzer v. Bank of Bermuda, Ltd.,* 385 F.Supp. 415, 418 (S.D.N.Y.1974), the court found satisfaction of both tests was necessary for a finding of subject matter jurisdiction. On the other hand, the Second Circuit in *Bersch v. Drexel Firestone, Inc., supra,* 519 F.2d at 993, formulated three categories of fact situations [11] in

---

**9.** For example, "interstate commerce" is defined to include transportation or communication "between any foreign country and any State." Securities Exchange Act of 1934, § 3(a)(17), 15 U.S.C. § 78c(a)(17); *see also* Securities Act of 1933, § 2(7), 15 U.S.C. § 77b(7).

**10.** For example, "[a] fundamental purpose, common to [the federal securities statutes], was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963) (italics in original) (footnote omitted) (jurisdiction under the Investment Advisors Act of 1940, 15 U.S.C. § 80b–1 *et seq.* (as amended)).

**11.** Judge Friendly concluded that the federal securities laws

(1) Apply to losses from sales of securities to Americans resident in the United States whether or not acts (or culpable failures to

act) of material importance occurred in this country; and

(2) Apply to losses from sales of securities to Americans resident abroad if, but only if, acts (or culpable failures to act) of material importance in the United States have significantly contributed thereto; but

(3) Do not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States directly caused such losses.

*Bersch v. Drexel Firestone, Inc., supra,* 519 F.2d at 993.

Of course, the courts may in reality by using a much more flexible, and more traditional, approach; that is, the courts may, in each particular fact situation, be balancing the competing interests presented. *See* Note, *American Adjudication of Transnational Securities Fraud, supra* note 4, 89 Harv.L.Rev. at 563; Comment, *Transnational Reach, supra* note 4, 121 U.Pa.L. Rev. at 1370–91; *cf.* Comment, *Jurisdiction in Transnational Securities Fraud Cases—SEC v. Kasser, supra* note 4, 7 Den.J. Int'l L. & Pol'y at 286 n.46 (suggesting "test" is too simplistic a term).

which the conduct and effects tests were applied alternatively. Other courts have applied only one test. *See, e. g., Straub v. Vaisman & Co., supra,* 540 F.2d at 595 (conduct test); *Investment Properties International, Ltd. v. IOS Ltd.,* CCH Fed.Sec.L. Rep. [70–71 Decisions], ¶ 93,011 at ¶ 90,735 (S.D.N.Y.), *aff'd without opinion* (2d Cir. 1971) (unreported) (effects test). We agree with those courts that jurisdiction may be established by meeting the requirements of either, not both, the conduct or effects test.

■ We are not convinced by Continental's argument that its loss as reflected in the financial statements of its parent American corporation, constitutes a domestic effect under the effects test.[12] In our opinion, the effect within the United States is not substantial, *see Restatement 2d* § 18(b)(ii), and, as was found by the district

court, too remote. *Cf. Bersch v. Drexel Firestone, Inc., supra,* 519 F.2d at 987–88 (generalized adverse effect not sufficient to confer subject matter jurisdiction). Nor do we view the nationality of defendants POI and Claassen as having any independent significance for jurisdictional purposes. *See ITT v. Vencap, Ltd., supra,* 519 F.2d at 1016.

Because Continental cannot satisfy the requirements of the effect test, defendant's allegedly fraudulent conduct within the United States remains as a possible basis for jurisdiction. The conduct test was first stated in *Leasco.* The Second Circuit approached the transaction in *Leasco* from the perspective of causation and concluded the domestic or intranational activity was an essential link in the perpetration of the fraudulent transaction. 468 F.2d at 1335.

12. The effects test was first stated in *Schoenbaum v. Firstbrook, supra,* 405 F.2d at 208. The court held there was subject matter jurisdiction, even though the securities "transactions which are alleged to violate the Act take place outside the United States, at least when the transactions involve stock registered and listed on a national securities exchange, and are detrimental to the interests of American investors." *Id.* The court believed that "Congress intended the Exchange Act to have extraterritorial application in order to protect domestic investors who have purchased foreign securities on American exchanges and to protect the domestic securities market from the effects of improper foreign transactions in American securities." *Id.* at 206; *see also Strassheim v. Daily,* 221 U.S. 280, 284–85, 31 S.Ct. 558, 55 L.Ed. 735 (1911); *United States v. Aluminum Co. of America,* 148 F.2d 416, 443 (2d Cir. 1945).

The effects test is set forth in *Restatement 2d,* § 18 (Jurisdiction to Prescribe With Respect to Effect Within Territory):

A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either (a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or (b) (i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and

(iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems.

The holding in *Schoenbaum* was limited to similar facts by *Leasco.* "When no fraud has been practiced in this country and the purchase or sale has not been made here, we would be hard pressed to find justification for going beyond *Schoenbaum.*" 468 F.2d at 1334. The court in *Leasco* stated that it did not believe "Congress meant to impose rules governing conduct throughout the world in every instance where an American company bought or sold a security." 468 F.2d at 1334. The scope of the effects test was further defined in *Bersch* and *IIT.* Specifically, the court in *Bersch* rejected general adverse financial effects as a basis of subject matter jurisdiction. 519 F.2d at 988. In *IIT* the court concluded that the losses of the American investors, who owned only .5% of a foreign investment trust, did not constitute the necessary "substantial effect" within the territory of § 18 of the *Restatement 2d.* 519 F.2d at 1017.

In the present case the only victim of the alleged fraud was a foreign corporation, Continental; the securities involved are those of a foreign corporation, PacSeeds, and were never registered or listed on a national securities exchange; and the financial loss to Continental Grain Corp., the American corporate parent, is not direct. In the present case, as in *Kasser,* "it is questionable whether any effect in the United States was wrought by the alleged fraudulent activities of the defendant[s]." 548 F.2d at 112.

Although some consideration was given to domestic effects (the plaintiffs were an American company and its shareholders),[13] the Second Circuit emphasized the "extensive acts" performed in the United States as well as the making of "substantial misrepresentations" which induced plaintiffs' action. *Id.* at 1335–37. After finding that considerations of international law did not preclude application of the federal securities laws because there was significant conduct in the United States, 468 F.2d at 1335, the court asked whether the laws should be applied. *Id.* In *Leasco*, the plaintiffs were Americans but the securities were foreign and neither registered nor traded on an organized American market nor sold within the United States. The court examined the language and legislative history of the securities laws and concluded that § 10(b) was meant "to protect against fraud in the sale or purchase of securities whether or not these were traded on organized United States Markets." *Id.* at 1336.

*Leasco* and *Schoenbaum* were reconsidered in the companion cases of *Bersch* and *IIT*. In *Bersch* the Second Circuit again asked whether Congress would have intended the federal securities laws to apply to a predominantly foreign transaction, 519 F.2d at 985, and ultimately set forth three categories in which the federal securities laws should be applied extraterritorially. *Id.* at 993; *see* note 11 *supra* (sets out categories). The third category, losses to foreigners, is relevant in the present case.[14] Under *Bersch* the federal securities laws would not apply to losses from sales of securities to foreigners [15] outside the United States *unless* acts or culpable failures to act within the United States directly caused the losses.

*Id.* The necessary domestic conduct was further defined in *IIT*; "this basis of jurisdiction is limited to the perpetration of fraudulent acts themselves and does not extend to mere preparatory activities or the failure to prevent fraudulent acts where the bulk of the activity was performed in foreign countries . . . ." 519 F.2d at 1018. The court frankly stated that

the distinction is a fine one. But . . . the line has to be drawn somewhere if the securities laws are not to apply in every instance where something has happened in the United States, however large the gap between the something and a consummated fraud and however negligible the effect in the United States or on its citizens.

*Id.* This language has been interpreted to require that the domestic conduct constitute the elements of a rule 10b–5 violation. *See FOF Proprietary Funds, Ltd. v. Arthur Young & Co., supra*, 400 F.Supp. at 1222–23; *Finch v. Marathon Securities Corp.*, 316 F.Supp. 1345, 1347–48 (S.D.N.Y.1970); Note, *American Adjudication of Transnational Securities Fraud, supra* note 4, 89 Harv.L.Rev. at 562. *But see American Law Institute, Federal Securities Code* § 1905 Note 2, p. 725 (Proposed Official Draft, May 1978).

We believe, however, that the Third Circuit in *SEC v. Kasser* extended the boundaries of the necessary domestic conduct required to find subject matter jurisdiction as defined in *Bersch–IIT*. The court in *Kasser* held subject matter jurisdiction existed "where at least some activity designed to further a fraudulent scheme occurs within

**13.** The author of *Extraterritorial Application, see* note 4 *supra*, 11 Cornell Int'l L.J. at 143, suggests that *Leasco* is actually an effects test case. The author finds the *Leasco* court's examination of the effect of the fraud on American interests to be the basis of its finding of jurisdiction. *Id.*

**14.** It has been suggested that the application of different rules on the basis of nationality may raise constitutional issues. *See generally* Note, *Extraterritorial Application, supra* note 4, 11 Cornell Int'l L.J. at 146 & n.67; Note, *American Adjudication of Transnational Securities Fraud,*

*supra* note 4, 89 Harv.L.Rev. at 569; Comment, *Transnational Reach, supra* note 4, 121 U.Pa.L. Rev. at 1376–77.

**15.** Large numbers of plaintiffs or class actions may raise other problems. *See IIT v. Vencap, Ltd., supra*, 519 F.2d at 1018 n.31; *Bersch v. Drexel Firestone, Inc., supra*, 519 F.2d at 986 & n.26. *See also* Note, *American Adjudication of Transnational Securities Fraud, supra* note 4, 89 Harv.L.Rev. at 570–71. Continental is a foreign corporation.

this country." 548 F.2d at 114. In *Kasser* the SEC brought an action for injunctive relief on behalf of Manitoba Development Fund, a Canadian corporation owned by the Province of Manitoba and organized to develop the forestry industry in that province. The Fund was the sole victim of a fraudulent scheme in which the two defendant corporations, Churchill Forest Industries, a Canadian corporation, and River Sawmills Co., a Delaware corporation, contracted with the Fund to develop a forestry complex. The corporations were largely owned and controlled by an American citizen, defendant Kasser. Under the scheme the Fund made loans to the corporations in exchange for their debentures. The loans were to be matched by capital in the equity securities of the two corporations; the loans and equity proceeds were to be used to finance the industrial development. Unfortunately, the defendants never made the specified equity investments and instead recirculated the proceeds of the loans and debentures, making the purported equity investments with the Fund's money. Eventually much of the money (over $45 million) was diverted to the personal use of the defendants; the two corporations became bankrupt. *Id.* at 111. The court reviewed the conduct which had occurred in the United States. This conduct included various negotiations, execution of one investment contract, use of mails and telephones, incorporation of the defendant companies, use of bank facilities as a conduit for the proceeds of the scheme, maintenance of records, drafting of instruments, and transmittal of proceeds. *Id.* The court concluded "there was significant conduct which formed part of the defendants' scheme that did occur within this country." *Id.* at 111–12.

The Third Circuit finally concluded that neither *IIT* nor *Bersch* precluded a finding of subject matter jurisdiction in *Kasser* and, in fact, that both cases "leant great sup-

port" to such a finding. *Id.* at 115. The court observed, somewhat cryptically, that the defendants' actions in the United States were substantial when viewed as a whole, that their conduct was much more substantial than that in either *IIT* or *Bersch*, and that it could not be dismissed as "merely preparatory" to fraudulent acts committed outside the country and may have been the direct cause, as required by the third category in *Bersch*, of the extraterritorial losses. *Id.*

In our view, the analysis in *Kasser* is also consistent with that in *Travis* wherein Judge Heaney stated "subject matter jurisdiction attaches whenever there has been significant conduct with respect to the alleged violations in the United States." 473 F.2d at 524. In *Travis*, the domestic plaintiffs [16] alleged that the defendants, three Canadian corporations and twenty-three individuals (largely Canadian), had misled them as to the true character of a tender offer and thereby excluded them from the opportunity to favorably participate in the benefits of the merger. *Id.* at 519. The court reviewed the incidents which occurred in the United States: numerous letters and telephone calls as well as the actual closing. The court concluded that these incidents were "essential elements in a slowly unfolding scheme to defraud the plaintiffs involving the use of the mails and instrumentalities of interstate commerce" and, when considered together, were "of such significance as to subject the defendants to the jurisdiction of the trial court." *Id.* at 526. Moreover, "[j]urisdiction [was] not lost because some significant steps in the fraudulent scheme took place in Canada . . . [n]or [was] jurisdiction lost because the securities were foreign securities neither registered nor traded on an organized United States market." *Id., citing Leasco Data Processing Equipment Corp. v. Maxwell, supra,* 468 F.2d at 1335–37.

---

**16.** Unlike *Kasser*, the plaintiffs in *Travis* were United States residents and shareholders of one of the defendant corporations. In addition, the misrepresentations were made in the United States. *Travis v. Anthes Imperial Ltd., supra,* 473 F.2d at 526; *see also Leasco Data Process-*

*ing Equipment Corp. v. Maxwell, supra,* 468 F.2d at 1337. To a certain extent the facts herein presented are the reverse of those in *Travis*: foreign v. domestic plaintiffs, domestic v. foreign defendants.

In the present case defendants argue jurisdiction is not proper because the transaction is predominantly foreign: a foreign corporate plaintiff, foreign securities neither registered nor traded on a national securities exchange, no impact or effect in the United States, and negotiations and conduct largely outside the United States. As discussed above, we have decided to apply the so-called effects and conduct tests alternatively. Therefore, the absence of a domestic plaintiff, domestic securities, or the use of a national securities exchange, in short the absence of a domestic impact or effect, will not necessarily preclude a finding of subject matter jurisdiction. Instead, we examine the relationship between defendants' conduct in the United States and the alleged fraudulent scheme, specifically whether defendants' conduct in the United States was significant with respect to the alleged violation, *see Travis v. Anthes Imperial Ltd., supra,* 473 F.2d at 524, and whether it furthered the fraudulent scheme, *see SEC v. Kasser, supra,* 548 F.2d at 114. The conduct in the United States cannot be "merely preparatory," *IIT v. Vencap, Ltd., supra,* 519 F.2d at 1018, and must be material, that is, "directly cause the losses," *Bersch v. Drexel Firestone, Inc., supra,* 519 F.2d at 993; *see also* note 1 *supra.* In our opinion, finding subject matter jurisdiction after such an analysis is consistent with the subjective territorial principle of international law, the intent of Congress and the remedial purpose of the federal securities laws. *Cf. American Law Institute, Federal Securities Code* §§ 1905(a)(1)(D) (extraterritorial application of code provisions to "any other prohibited, required or actionable conduct whose constituent elements occur to a substantial (but not necessarily predominant) extent within the United States"), 1905(a)(2) (extraterritorial application, within limits of international law, of antifraud provisions to conduct with respect to sale or purchase of a security if "initiated within the United States although it occurs outside the United States"), & Note 2 ("constituent elements" phrase in § 1905(a)(1)(D) is not limited to acts essential to the establishment of the "prohibited, required, or actionable conduct") (Proposed Official Draft, May 1978).

The scheme alleged by Continental involved the nondisclosure [17] by POI and Claassen, with the cooperation of Northrup, King of Northrup, King's claim of exclusive possession of the licensed hybrid seedstock. Defendants' conduct in the United States consisted of letters and telephone calls [18] which were necessary to further the fraudulent scheme and, in fact, constituted the organization and completion of the fraud. In addition, Claassen is a citizen of the United States and resident of California and POI is incorporated in the United States as is Northrup, King. Facilities of interstate commerce were also used to transmit the proceeds and to transport POI corporate representatives to Australia for the closing and then back to California. In our view, defendants' conduct was significant and not "merely preparatory." Even though the ultimate effect, that is, Continental's purchase of PacSeeds,[19] was felt in Australia, the fraudulent scheme of nondisclosure was devised and completed in the United States. Then it was "exported" to Australia. "We do not think Congress intended to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." *IIT*

17. Like the district court, we view the assignment of a situs to an omission or nondisclosure as a very difficult task. We have not found any comparable cases. Our analysis in the present case, however, focuses upon defendants' conduct; the factual situs or place of effect is not critical to that analysis.

18. Both the place of sending and the place of receipt constitute locations in which conduct takes place when the mails or instrumentalities of interstate commerce are used to transmit communications. *Travis v. Anthes Imperial Ltd., supra,* 473 F.2d at 524 n.16.

19. Continental asserts it would not have purchased the stock had it known of the prospective claim by Northrup, King. *See City National Bank v. Vanderboom,* 422 F.2d 221, 229–32 (8th Cir.), *cert. denied,* 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970).

*v. Vencap, Ltd., supra*, 519 F.2d at 1017. Unlike those transnational securities cases in which materials, *e. g., Bersch v. Drexel Firestone, Inc., supra*, 519 F.2d at 979–80, or advertisements, *e. g., United States v. Cook, supra*, 573 F.2d at 232, were sent abroad, the present case involves nondisclosure rather than misrepresentation. It is well-settled, however, that § 10b prohibits non-disclosure as well as affirmative misrepresentation of material facts affecting a security. *E. g., Arber v. Essex Wire Corp.*, 490 F.2d 414, 418 (6th Cir. 1974), *citing SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968).

Further, our finding that defendants' conduct in the United States, consisting in part of the use of the mails and instrumentalities of interstate commerce, in furtherance of the fraudulent scheme was significant and thus provides a jurisdictional basis for Continental's action is consistent with the position of the courts in wholly domestic securities fraud cases. *E. g., Kerbs v. Fall River Industries, Inc.*, 502 F.2d 731, 737 (10th Cir. 1974); *Myzel v. Fields*, 386 F.2d 718, 727–28 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

In sum, where defendants' conduct in the United States was in furtherance of a fraudulent scheme and was significant with respect to its accomplishment, and moreover necessarily involved the use of the mails and other instrumentalities of interstate commerce, *see SEC v. Gulf Intercontinental Finance Corp.*, 223 F.Supp. 987, 995 (S.D.Fla.1963), the district court has subject matter jurisdiction.

We frankly admit that the finding of subject matter jurisdiction in the present case is largely a policy decision. This is true to a certain degree in the other transnational securities cases. The present case, however, involves a substantially foreign transaction, little if any domestic impact, and domestic conduct which consisted for the most part of use of the mail and telephones. Nonetheless, we do not believe that our finding of jurisdiction is unwarranted nor, if such finding is an extension of previous cases, inconsistent with the principles outlined in those cases. As noted by the Third Circuit in *Kasser*, the "securities acts expressly apply to 'foreign commerce,' thereby evincing a Congressional intent for a broad jurisdictional scope for the 1933 and 1934 Acts." 548 F.2d at 114 (footnote omitted). Like the Second Circuit, we are reluctant to conclude that Congress would have intended the securities laws to have a global reach when the domestic conduct is insubstantial or the domestic impact is too generalized or insignificant. The range of significant conduct should, however, be fairly inclusive. This is consistent with the general purpose of the securities laws to mandate the highest standards of conduct in securities transactions. "Consequently, we decline to immunize, for strictly jurisdictional reasons, defendants who unleash from this country a pervasive scheme to defraud a foreign corporation." *Id.*

The Third Circuit in *Kasser*, in answering affirmatively the question whether Congress would have intended the statutes to be applied extraterritorially, set forth three policy rationales to support its finding of jurisdiction.

> First, to deny such jurisdiction may embolden those who wish to defraud foreign securities purchasers or sellers to use the United States as a base of operations . . . [and to in effect] create a haven for such defrauders and manipulators. We are reluctant to conclude that Congress intended to allow the United States to become a "Barbary Coast," as it were, harboring international securities "pirates."

*Id.* at 116. Second, the court was concerned with the prospect of unfavorable reciprocal responses by other nations and, by finding jurisdiction in *Kasser*, hoped to encourage effective antifraud enforcement internationally. *Id.* Finally, the court emphasized that a finding of jurisdiction was consistent with the intent of Congress, as expressed in the antifraud provisions of the federal securities laws, to elevate the standard of conduct in securities transactions. *Id.* We

agree with these policy rationales and believe that they support a finding of subject matter jurisdiction in the present case.

*Personal Jurisdiction and Venue*

For practical purposes our decision as to the question of subject matter jurisdiction affirmatively resolves the related questions of personal jurisdiction and venue. *See Travis v. Anthes Imperial Ltd., supra,* 473 F.2d at 528–30; *Hooper v. Mountain States Securities Corp.,* 282 F.2d 195, 204–05 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); *Arpet, Ltd. v. Homans,* 390 F.Supp. 908, 911 (W.D.Pa. 1975); *Burkhart v. Allson Realty Trust,* 363 F.Supp. 1286, 1292 (N.D.Ill.1973).

We note, however, that the establishment of venue in the District of Minnesota need not prevent the transfer of the action to some other district under the doctrine of *forum non conveniens.* 28 U.S.C. § 1404(a); *e. g., Harris v. American Investment Co.,* 333 F.Supp. 325, 326–27 (E.D.Pa.1971). Such consideration would seem appropriate in light of the July 1978 settlement of the underlying litigation between Continental and Northrup, King,[20] and the district court's transfer of the remaining issues to the District Court for the Northern District of California, where a similar action is pending.[21]

The judgment of the district court is reversed and remanded.

---

20. *Pacific Oilseeds (Australia) Pty. Ltd. v. Northrup, King & Co.,* No. 4–74–Civ. 602 (D.Minn., dismissed with prejudice, July 26, 1978).

21. *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.,* No. C–77–1666 (N.D. Cal.).